RANJIT JAIN, M.D., FRANK D. SILVER, M.D., AND JOHN DUDEK, M.D., APPELLANTS, v. JERLEAN McFARLAND, RESPONDENT.

No. 22646

May 7, 1993                                   851 P.2d 450

---

[4]THE HONORABLE CHARLES E. SPRINGER, Justice, did not participate in the decision of this matter.

*Alverson, Taylor, Mortensen & Nelson,* Las Vegas, for Appellant Jain.

*Beckley, Singleton, DeLanoy, Jemison & List* and *Daniel F. Polsenberg,* Las Vegas, for Appellant Silver.

*Hafen & Mayor,* Las Vegas, for Appellant Dudek.

*Barker, Gillock, Koning & Brown,* Las Vegas, for Respondent.

*Vargas & Bartlett* and *Jeffrey J. Whitehead,* Reno, for Amici Curiae American Medical Association, Nevada State Medical Association, and Nevada Hospital Association.

## OPINION

*Per Curiam:*

### Facts

On August 1, 1985, Jerlean McFarland (Ms. McFarland) underwent a total abdominal hysterectomy and anterior vaginal repair. After the surgery, she experienced urinary incontinence and was referred to Dr. Ranjit Jain (Dr. Jain), a board-certified urologist. Ms. McFarland's complaint was that she was "wet all the time." Dr. Jain knew that Ms. McFarland had recently had a hysterectomy, but he did not perform a "methylene blue test" to detect a possible vesicovaginal fistula,[1] a hole between the bladder and vaginal wall which causes leakage of urine to the vagina. Instead, Dr. Jain diagnosed stress incontinence, and on November 1, 1985, he performed a Stamey procedure[2] to lift the bladder. Following the Stamey procedure, Ms. McFarland still leaked urine. To cope with the problem, she resorted to wearing diapers and became so depressed that she considered committing suicide.

When the leakage worsened, Ms. McFarland asked Dr. Jain to locate the problem. On February 26, 1986, as a last resort, Dr. Jain performed the "methylene blue test" and diagnosed a vesicovaginal fistula. However, because Ms. McFarland's insurance had lapsed, she had no coverage until she could return to work as a bathroom attendant. Dr. Jain did not inform Ms. McFarland that she should receive prompt treatment while the fistula was still the size of a pinhole or that a simple cauterization procedure

---

[1] A fistula is "an abnormal passage from an abscess, cavity, or hollow organ to the skin or to another abscess, cavity or organ." Webster's New World Dictionary 511 (3d college ed. 1989).

[2] A Stamey procedure is a commonly performed urological procedure to correct stress incontinence.

was available. He also did not attempt to follow up on her treatment. At trial, he testified that he thought he would be in trouble if he treated a patient who did not have insurance.

By the fall of 1986, Ms. McFarland's urine leakage had intensified. Having returned to work in February, 1986, she was again eligible for insurance. In September, 1986, Dr. Frank Silver (Dr. Silver), a board-certified gynecologist, diagnosed a vesicovaginal fistula. On October 6, 1986, Dr. Silver attempted a transvaginal repair, but Ms. McFarland still leaked urine. Dr. Silver subsequently referred her to Dr. John Dudek (Dr. Dudek), a board-certified urologist. Dr. Silver and Dr. Dudek jointly decided to operate to re-repair the vesicovaginal fistula. On December 9, 1986, only two months after the prior surgery, they operated on Ms. McFarland, using the "bladder" or "abdominal" approach preferred by urologists, rather than the vaginal approach Dr. Silver used on his first attempt.

Shortly after the surgery, Ms. McFarland continued to leak urine. Due to her discomfort and embarrassment, she stopped singing in her church choir and had to leave her son's high school graduation ceremony early. Her husband divorced her in 1987 because her condition interfered with her ability to have sexual relations. On March 1, 1988, Dr. Ehrlich and Dr. Raz at the UCLA Medical Center attempted a third fistula repair. The surgery was only partially successful, and Ms. McFarland must undergo surgery at least one more time.

On January 4, 1989, Ms. McFarland brought an action before the medical-legal screening panel (the screening panel), as required by NRS 41A.016(1).[3] The screening panel found no reasonable probability of medical malpractice on the part of Dr. Jain, Dr. Silver, or Dr. Dudek. Ms. McFarland subsequently obtained the depositions of several other doctors.

On January 31, 1989, Ms. McFarland filed a complaint in the district court alleging that Dr. Jain failed to timely diagnose the vesicovaginal fistula. She further alleged that Dr. Silver and Dr. Dudek were negligent in failing to properly repair the fistula. On July 2, 1991, the parties' attorneys met in a pre-trial conference in the chambers of the district court to decide how to handle the screening panel findings at trial. The court stated that it would not preclude Mr. Gillock, counsel for Ms. McFarland, from disclos-

---

[3]NRS 41A.016(1) provides:

> No cause of action involving medical malpractice may be filed until the medical malpractice case has been submitted to an appropriate screening panel and a determination made by such panel as provided in NRS 41A.003 to 41A.069, inclusive, and any action filed without satisfying the requirements of those sections is subject to dismissal without prejudice for failure to comply with this section.

ing the dates on which Ms. McFarland hired her experts, which were subsequent to the screening panel decision.

The trial lasted from July 8 to July 13, 1991. The jury returned a verdict against Dr. Jain in the sum of $978,860.00, against Dr. Silver in the sum of $69,941.00, and against Dr. Dudek in the sum of $209,823.00, a twenty-five percent/seventy-five percent apportionment of damages as between Dr. Silver and Dr. Dudek, respectively. With respect to Dr. Jain, the jury rated Ms. McFarland's comparative negligence at twenty-three percent, reducing the verdict against Dr. Jain to $753,722.20. On July 25, 1991, the district court entered a judgment on the jury verdict against the appellants that included an additional award of pre-judgment interest on the past damages.

## Discussion

### The Medical-Legal Screening Panel

The appellants argue that the district court violated NRS 41A.016(2)[4] when it allowed Ms. McFarland's counsel, Mr. Gillock, to tell the jury that the screening panel had not received certain witnesses' testimony. The appellants further argue that this evidence concerning other witnesses "frustrates the legislative intent in enacting the screening panel scheme as it did." The appellants complain that the district court allowed Ms. McFarland to state what evidence the screening panel did not have before it, but the court prohibited them from informing the jury what evidence the panel did have before it.

The minutes of the July 2, 1991, pretrial conference reflect that the court ruled as follows:

> Court stated it will not preclude Mr. Gillock from arguing the dates the experts were hired.

During his opening argument at the trial, Mr. Alverson, counsel for Dr. Jain, started to address the subject of the screening panel's findings. The relevant portions of the trial transcript are as follows:

---

[4]NRS 41A.016(2) provides:

The written findings of the screening panel are admissible in any action concerning that complaint which is subsequently filed in the district court. No other evidence concerning the screening panel or its deliberations is admissible and no member of the screening panel may be called to testify in any such action.

*See* Truck Ins. Exchange v. Tetzlaff, 683 F.Supp. 223 (D.Nev. 1988) (provisions of NRS 41A.016 are mandatory and court has no discretion to refuse to apply them where the asserted liability is clearly grounded on alleged medical malpractice).

[MR. ALVERSON]: In the State of Nevada, before you can file a complaint against a doctor for medical malpractice, the law requires that you file a petition—it's kind of like a complaint—a petition before a group known as the Medical Legal Screening Board [sic]. And what that is, it's a group of two panels: one panel of doctors and one panel of lawyers. And the lawyers, on behalf of their client, both the patient and the doctor, the Plaintiff prepares a document with the medical records and affidavits, and presents them to this panel. And the Defendants do the same thing and put all their cards on the table and tell you . . .

MR. GILLOCK: Well, wait just a minute, your Honor. I think that Mr. Alverson has certainly gone beyond the Court's admonition, and also gone beyond what the statute allows him to say.

THE COURT: It's 41A?

MR. GILLOCK: Yes. And he also knows all the cards weren't on the table.

THE COURT: The statute is rather explicit that you cannot discuss the deliberations of the panel or what was submitted to it, as I recall.

. . . .

MR. ALVERSON: I certainly have the right to say that they had the opportunity to put all the cards on the table.

MR. GILLOCK: Well, wait just a minute. That's even beyond. He knows he's out of line here, your Honor, and I object.

During closing argument, Mr. Gillock stated as follows:

And the Defendants have thrown up every conceivable road block along the way that it is possible to throw up—careless testimony, loose testimony, the screening panel, three local doctors, three local lawyers. They parade in a big sign that says the screening panel found that the Defendants were exonerated. But yet, every lawyer in this courtroom knows at the time of the screening panel hearing and knows that since then we have acquired Dr. Sparkuhl's deposition, Dr. Hirsch's deposition, Dr. Ehrlick's [sic] deposition. Dr. Rosenstein's current opinions as to the standard of care and the causation have been acquired since then. Dr. Rosenstein was employed in 1990. The screening panel was in 1989.

The purposes of the screening panel are to minimize frivolous suits against doctors, to encourage settlement, and to lower the costs of malpractice premiums and health care. In accord with the majority of states, Nevada provides for the admission of the panel

decision at trial as mere evidence, as opposed to conclusive evidence. Jean A. Macchiaroli, *Medical Malpractice Screening Panels: Proposed Model Legislation to Cure Judicial Ills,* 58 Geo. Wash. L. Rev. 181, 193 (1990). Nevada is one of three states that expressly prohibits calling a panelist as a witness, while allowing admission of the panel decision. *Id.* at 194.

NRS 41A.016(2) states that the findings of the medical-legal screening panel and "no other evidence" concerning the screening panel or its deliberations is admissible in any action subsequently filed in district court. We hesitate to disturb or question carefully crafted legislation which balances various concerns to arrive at a structure that will fairly benefit all the parties to a medical malpractice suit, limit the burdens on the judicial system, and reduce health care costs by discouraging frivolous litigation. In Dubler v. Stetser, 430 A.2d 962 (N.J.Super.Ct.App. Div. 1981), the court analyzed a statute similar to NRS 41A.016 and held that when instructing the jury as to its approach to medical malpractice panel findings, the trial judge must explain the function of the malpractice panel. In this regard, the judge should set forth the identity of each of the three panel members, as to profession only, because the findings of the panel would be virtually meaningless to a jury which was unaware of the occupations of panel members. *Id.*

We agree with the *Dubler* court that the district court's identification of the professional composition of the panel is a vital prerequisite in order for the jury to understand the panel's function and to give proper weight to the panel's findings. The jury may receive this information through an instruction from the court or arguments by counsel.

Once a finding of no medical malpractice is made in favor of a physician by the medical-legal screening panel, the defending physician strives to make the most of that decision if the plaintiff pursues the action in district court. Mr. Alverson attempted to do this by saying that the parties had the opportunity to "put all their cards on the table" when appearing before the panel, and thereby inferring that the parties put forth all available evidence. In fact, the medical-legal screening panel usually receives medical records and affidavits from physicians, and not live testimony. It is a summary process to screen those frivolous or marginal cases. It is not a full trial on the merits and should not be represented as such. The district judge felt that Alverson's statement was misleading and sustained an objection to it. We agree and conclude that the district court properly precluded Mr. Alverson from asserting that "all the cards were on the table" at the medical-legal screening panel.

Mr. Gillock told the jury that physicians' depositions and opinions concerning the standard of care were taken or acquired since the medical-legal screening panel hearing. We see nothing wrong with this argument. NRS 41A.069 directs that the panel's findings are to be given the same weight as other evidence and are not to be conclusive. A plaintiff has the right to present evidence at trial that was not before the medical-legal screening panel, and the plaintiff should have the ability to articulate when that evidence was acquired or when a deposition was taken. The district court acted within its discretion when it allowed Mr. Gillock to argue the dates of the depositions and when certain medical opinions were acquired.

*Expert Testimony*

Appellant Dr. Silver, a board-certified gynecologist, contends that Dr. Rosenstein, a board-certified urologist, could not testify as to the standard of care required of Dr. Silver. Dr. Silver further contends that, if this court excludes Dr. Rosenstein's testimony, no competent expert evidence remains against him, and therefore Dr. Silver is entitled to judgment as a matter of law.

Dr. Rosenstein did not find fault with the surgery performed by Dr. Silver in October, 1986, using the gynecological approach to fistula repair. He also stated he was not qualified to render an opinion as to the gynecological standard of care for that surgery. However, Dr. Rosenstein was qualified as an expert, with knowledge of the critical timing between the two 1986 surgeries, as follows:

> Q: Are you familiar with the standard required of a gynecologist, as well as a urologist, with respect to the timing of the repairs of the surgeries?
> A: Yes.

Appellants Dudek and Silver both testified that they made a joint decision regarding the timing of the second surgery, and that they both performed the second surgery using an approach through the bladder. Dr. Rosenstein testified that he was knowledgeable regarding the technique used in the second surgery, and that he had performed this same type of surgery with the assistance of a gynecologist. He also testified that gynecologists and urologists use different surgical approaches when repairing fistulas. As for the timing of the surgeries, he stated, in pertinent part:

> The overwhelming majority of urologists—and I believe gynecologists as well, but *I'm not an expert on gynecology,* so I can't tell you that a hundred percent, but I can tell you

the urologic literature, the common wisdom, is to wait a minimum of three to six months after either the creation of a fistula, or the development of a fistula subsequent to an attempted repair.

(Emphasis added.)

The determination of the competency of an expert witness is within the discretion of the trial court. Freeman v. Davidson, 105 Nev. 13, 16, 768 P.2d 885, 887 (1989). As a general rule, a plaintiff must use expert testimony to establish medical malpractice. *See* NRS 41A.100(1); Beattie v. Thomas, 99 Nev. 579, 584, 668 P.2d 268, 271 (1983); Stevens v. Duxbury, 97 Nev. 517, 519, 634 P.2d 1212, 1214 (1981). An expert witness need only be qualified to render an expert opinion with respect to the exact issue on which he is testifying. *See* Rees v. Roderiques, 101 Nev. 302, 304, 701 P.2d 1017, 1019 (1985) ("[t]here is no requirement that the expert medical witness be from the same specialty as the defendant; the issue is simply one of the witness' actual knowledge"); *see also* Gaston v. Hunter, 588 P.2d 326, 344 (Ariz. 1978) ("an expert witness may be qualified to give an opinion by reason of actual experience or careful study").

Dr. Rosenstein testified that the timing of the surgeries was within his area of expertise. The fact that he is an expert in a different, but related, specialty goes to the weight, not the admissibility, of his testimony. We have recently held that there are some areas of medical expertise that are common to all, or at least most, physicians. *See* Fernandez v. Admirand, 108 Nev. 963, 843 P.2d 354 (1992). We believe this is a similar situation. Therefore, we conclude that the district court properly designated Dr. Rosenstein an expert with respect to Dr. Silver.

According to Dr. Rosenstein, surgical timing and technique must be analyzed together, and surgeons need to use extraordinary efforts and special techniques when performing surgery on a vesicovaginal fistula only two months after a prior surgery. Dr. Rosenstein stated that Dr. Dudek and Dr. Silver did not use any of the recommended extraordinary techniques, and that to a degree of medical probability, the timing of the second attempted repair was the cause of its failure. Therefore, we conclude that Ms. McFarland presented competent expert testimony against Dr. Silver, and we affirm the judgment against him.

*Arguing Damages*

In his opening summation, Mr. Gillock specifically addressed

damages, with a detailed list of suggested amounts for each claim. Counsel for Dr. Silver and Dr. Dudek rebutted Mr. Gillock's argument with respect to damages. Nevertheless, Dr. Silver argues that the court should have declared a mistrial when Mr. Gillock began rearguing the question of damages during his rebuttal summation. Dr. Silver contends this reargument of damages was improper and prejudicial and cites two cases in support of his contentions: Smith v. Hill, 409 So.2d 141 (Fla.Dist. Ct.App. 1982), and Heddendorf v. Joyce, 178 So.2d 126 (Fla. Dist.Ct.App. 1965). In *Heddendorf,* the court stated that it gives one party an unfair advantage if he closes his argument by raising a subject for the first time. *Id.* at 129. However, in both *Heddendorf* and *Smith,* the plaintiff's counsel made no, or only minimal, mention of damages in his opening summation, then produced a detailed chart on rebuttal. In contrast, Mr. Gillock specifically addressed the subject of damages in his opening summation. Therefore, we conclude that Dr. Silver's contention lacks merit.

*Comment on the Failure of Dr. Dudek to Testify in His Case-In-Chief*

Dr. Dudek's counsel informed the court, in the presence of the jury, that two witnesses would testify in Dr. Dudek's case-in-chief. Instead, Dr. Dudek called no witnesses, not even himself, to testify on his behalf. In his closing argument to the jury, Mr. Gillock commented on the failure of Dr. Dudek and Dr. Dudek's medical expert, Dr. William Freedman (Dr. Freedman), to testify at trial.[5] The adverse inference from Mr. Gillock's comments was that Dr. Dudek was indifferent about Ms. McFarland's case and her condition. Mr. Gillock commented, in his closing argument, as follows:

> Dr. Dudek didn't even take the time to come down and testify in his own case. That's how important Jerlean McFarland is.

Dr. Dudek objected, and asserted that Dr. Dudek did testify in this case. Mr. Gillock then noted that Dr. Dudek never returned to the courtroom after he testified in Ms. McFarland's case. Dr. Dudek contends that Mr. Gillock's comments during closing argument were impermissible.

Arguments of counsel are not evidence and do not establish the

[5]Since Dr. Dudek failed to preserve an objection to the comment about Dr. Freedman, we do not reach that issue. Unless an issue is jurisdictional, an issue which is not raised in the trial court is not reached on appeal. Old Aztec Mine, Inc. v. Brown, 97 Nev. 49, 52, 623 P.2d 981, 983 (1981).

facts of the case. Phillips v. Allstate Ins. Co., 603 P.2d 1105, 1108 (N.M.Ct.App. 1979); *see* Lord v. State, 107 Nev. 28, 33, 806 P.2d 548, 551 (1991); Klein v. State, 105 Nev. 880, 884, 784 P.2d 970, 972-73 (1989). Counsel is allowed to argue any reasonable inferences from the evidence the parties have presented at trial. *Klein,* 105 Nev. at 884, 784 P.2d at 973; State v. Teeter, 65 Nev. 584, 642, 200 P.2d 657, 685 (1948). During closing argument, trial counsel enjoys wide latitude in arguing facts and drawing inferences from the evidence. *Teeter,* 65 Nev. at 642, 200 P.2d at 685.

In the instant case, Mr. Gillock's comments were not inflammatory, nor did he make representations unsupported by the evidence. Dr. Dudek's counsel did state that Dr. Dudek would testify in his case-in-chief. Mr. Gillock commented on Dr. Dudek's subsequent failure to testify and his absence from the courtroom, and Mr. Gillock drew a reasonable inference from those facts and that absence. Accordingly, Mr. Gillock's comments did not mislead the jury.

Dr. Dudek further argues that the wide disparity in verdicts against Dr. Dudek and Dr. Silver is attributable to Mr. Gillock's comments during closing argument. However, the jury had evidence that justified disparate damage verdicts against Dr. Dudek and Dr. Silver. Dr. Silver referred Ms. McFarland to Dr. Dudek for his urological expertise. The surgical procedure was urological, an approach through the bladder, rather than gynecological, as with Dr. Silver's first surgical repair, which was vaginal. Dr. Rosenstein, a urologist, testified that when he associates with a gynecologist to do a fistula repair through the bladder, the gynecologist assists him. Therefore, the jury could have weighed the evidence and the credibility of the witnesses and determined that Dr. Dudek, the urologist, bore the primary responsibility for the surgery. Also, the jury instructions allowed the jury to return separate verdicts against each of the appellants.

We conclude that counsel's latitude during closing argument encompasses room for comment on the failure of scheduled witnesses to testify, and that the disparity in verdicts is attributable to the evidence rather than Mr. Gillock's comments. Therefore, the district court properly allowed Mr. Gillock's remarks during closing argument.

*Prejudgment Interest*

The district court computed the award of prejudgment interest against Dr. Dudek for past damages at the rate of twelve percent per year from the time of the service of the summons and complaint. The jury awarded $149,823.00 for past damages, and

the district court determined that the amount of prejudgment interest on past damages was the sum of $44,017.18.

Dr. Dudek contends that the district court erred because it should have applied a different interest rate. He claims that the interest rate should have been the prime rate on July 1 immediately preceding the July 25, 1991, date of judgment, plus two percent. This results in a rate of ten and one-half percent, and an interest award of $38,141.77. Under the 1981 version of NRS 17.130(2), a twelve percent prejudgment interest rate applied. In 1987, NRS 17.130(2) stated in pertinent part as follows:

> When no rate of interest is provided by contract or otherwise by law, or specified in the judgment, the judgment draws interest from the time of service of the summons and complaint until satisfied, except for any amount representing future damages, which draws interest only from the time of the entry of the judgment until satisfied, at a rate equal to the prime rate at the largest bank in Nevada . . . on January 1 or July 1, as the case may be, immediately preceding the date of judgment, plus 2 percent.

The reviser's note to NRS 17.130 states that the provisions of the act apply only to causes of action which arise on or after July 1, 1987. Under the 1987 version of the statute, with its sliding interest rate based on changes in the prime rate, the district court should have computed the prejudgment interest at a rate of ten and one-half percent.

The question, therefore, is, for the purposes of determining prejudgment interest, on what date Ms. McFarland's cause of action arose. Traditionally, a cause of action accrues the moment a plaintiff suffers an injury or wrong. Petersen v. Bruen, 106 Nev. 271, 274, 792 P.2d 18, 20 (1990) (a cause of action accrues when the wrong occurs and the party sustains injuries); Boulder City v. Miles, 85 Nev. 46, 49, 449 P.2d 1003, 1005 (1969) (a cause of action accrues when forces wrongfully put in motion produce an injury); *see* Cantonwine v. Fehling, 582 P.2d 592, 596 (Wyo. 1978) (when a wrong has been committed, the cause of action has accrued although the claimant may be ignorant of it); *see also* 1A C.J.S. *Actions* § 230 (1985); 1 Am.Jur.2d *Actions* § 88 (1962). NRS 41A.097(1), under which the statute of limitations is tolled until the injured party discovers or reasonably should have discovered the injury, is inapplicable here in calculating prejudgment interest. Thus, we hold that Ms. McFarland's cause of action arose in 1986 when the negligence was committed.

Given that Ms. McFarland's cause of action arose prior to July 1, 1987, we conclude that the district court properly applied the

twelve percent prejudgment interest rate under the 1981 version of NRS 17.130(2). *See* Arnold v. Mt. Wheeler Power Co., 101 Nev. 612, 615, 707 P.2d 1137, 1139 (1985) (prejudgment interest should be computed with the statutory interest rate in effect at the time the action arose).

For the reasons discussed above, we affirm the judgment.[6]

---

[6]THE HONORABLE MIRIAM SHEARING, Justice, did not participate in the decision of this appeal.