TRAVERS ARTHUR GREENE, AND LEONARD ARTHUR WINFREY, APPELLANTS, *v.* THE STATE OF NEVADA, RESPONDENT.

No. 27988

January 4, 1997
931 P.2d 54

[Rehearing denied May 20, 1998]

*David M. Schieck,* Las Vegas, for Appellant Greene.

*Nathaniel J. Reed* and *Norman Reed,* Las Vegas, for Appellant Winfrey.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Stewart L. Bell,* District Attorney, and *James Tufteland,* Chief Deputy District Attorney, Clark County, for Respondent.

## OPINION

By the Court, SHEARING, J.:

In the early morning hours of September 23, 1994, appellants Travers Arthur Greene and Leonard Arthur Winfrey drove to Sunrise Mountain in a stolen blue Camaro, armed with stolen weapons, an M-14 assault rifle and a handgun. They intended to experiment with the rifle to see how big a hole it would make when fired at something. Upon reaching the top of Sunrise Mountain, they spotted a powder blue Volkswagen with Deborah Farris and Christopher Payton sleeping beside it. Winfrey drove the Camaro up to the Volkswagen and stopped, shining the headlights on Farris and Payton. Armed with the assault rifle, Greene immediately exited the Camaro and shot Payton in the head. Greene then attempted to shoot Farris, but the assault rifle jammed. While Greene tried to unjam the rifle, Farris began pleading for her life, crying "please don't do this." Meanwhile, Winfrey, who was monitoring the situation from the car, exited the vehicle, pointed the handgun at Farris and pulled the trigger. However, the handgun also malfunctioned and no bullet discharged. At this point, Farris continued to plead with Greene and Winfrey not to kill her. Shortly thereafter, Greene succeeded in fixing the assault rifle, pointed it at her head and shot her in the neck, saying "shut up, bitch."

Heather Barker witnessed these killings while seated in the Camaro. Barker had been at Winfrey's apartment earlier that evening, and Greene and Winfrey had promised to give her a ride home. After the first shot was fired, Barker said to Winfrey, "oh, my God, did he shoot somebody, I want to go home." Barker also heard a female voice saying, "please don't do this, you could take anything, you could take my car, just please don't do this." Barker was a friend of Winfrey's but had not met Greene until that evening.

After the killings, Green and Winfrey got back into the Camaro. As they were driving away, Greene laughed about how it looked when the eyeballs popped out of Payton's head. He also derisively talked about how the blood bubbled out of Farris's neck when he shot her.

After leaving Sunrise Mountain, Winfrey drove to Barker's house and Greene cleaned the assault rifle in her bathroom. The three then went to Winfrey's apartment where they had met earlier that evening. Greene left in the car, Winfrey went up to his bedroom to sleep, and Barker walked home.

The next day, Phil Souza, Winfrey's roommate, noticed that Winfrey acted as if something was bothering him. When the eleven o'clock news showed a story about two people being killed on Sunrise Mountain, Winfrey became upset and began banging his head on the ground. Approximately 45 minutes later, Greene arrived and Souza overheard Greene say, "they found the bodies," and "we are not through yet." Winfrey made no statement regarding what had happened. The following day Souza approached a policeman on the street and told him what he had observed.

This information led to the investigation of both Greene and Winfrey and their subsequent arrest for the murders of Farris and Payton. On September 25, 1994, Greene and Winfrey were each charged by way of Information with: one count of conspiracy to commit murder; two counts of murder with use of a deadly weapon; and one count of possession of a stolen vehicle.

The State filed notice to seek the death penalty against both defendants, alleging the following circumstances: (1) the murder was committed to avoid or prevent a lawful arrest or to effect an escape from custody, NRS 200.033(5); (2) the murder was committed upon one or more persons at random and without apparent motive, NRS 200.033(9); (3) the defendant has, in the immediate proceeding, been convicted of more than one offense of murder in the first or second degree, NRS 200.033(12).[1]

The first jury trial was conducted jointly with Greene and Winfrey as co-defendants. However, due to incurable *Bruton* issues, the district court granted a mistrial to Greene. Thereafter, the first jury trial continued against Winfrey alone, and a second separate jury trial commenced against Greene. Both Greene and Winfrey were convicted of all charges.

Greene and Winfrey each had separate penalty hearings. Against Greene, the jury found the following aggravators for both killings: (1) the murder was committed upon one or more persons at random and without apparent motive, NRS 200.033(9); and (2) the defendant has, in the immediate proceeding, been convicted of more than one offense of murder in the first degree, NRS 200.033(12). Against Greene, the special verdicts reflect that the jury also found the following mitigating circumstances: (1) youth of the defendant at the time of the crime; and (2) any other mitigating circumstances to exist in this case. The jury determined that the aggravators outweighed the mitigators and conse-

---

[1]Effective October 1, 1995, the "more than one offense" aggravating circumstance was renumbered from NRS 200.033(10) to NRS 200.033(12). All further references to this statutory section will be to NRS 200.033(12).

quently returned a death verdict against Greene. Greene was sentenced to death for both murder counts, six years for conspiracy to commit murder, a consecutive ten years and restitution of $1,000 for possession of a stolen vehicle.

Against Winfrey, the jury found the aggravating factor in Payton's murder to be that the defendant had, in the immediate proceeding, been convicted of more than one offense of murder in the first degree under NRS 200.033(12). The jury found the aggravating factor in Farris's murder to be that the murder was committed upon one or more persons at random and without apparent motive under NRS 200.033(9). However, the jury did not return a death verdict against Winfrey. Instead, Winfrey was sentenced to two consecutive life sentences without the possibility of parole for both counts of murder, six years for conspiracy to commit murder, a consecutive ten years and restitution of $1,000 jointly and severally with Greene for possession of a stolen vehicle.

Greene and Winfrey filed timely notices of appeal from the judgments of conviction.[2]

### Greene's appeal

#### Improper testimony

Greene asserts that the prosecutor improperly elicited testimony from witness Phil Souza, appellant Winfrey's roommate at the time of the murders, which constituted prior bad act evidence not falling under any exception enumerated in NRS 48.045(2).

NRS 48.045(2) provides:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

Although evidence may be admissible under the exceptions cited in NRS 48.045(2), the determination whether to admit or exclude evidence of separate and independent criminal acts rests within

---

[2]By way of a motion granted by this court prior to oral argument, appellant Greene incorporated into his appeal several arguments originally raised in appellant Winfrey's brief; namely, whether NRS 200.033(9) and (12) are unconstitutional and whether sufficient evidence existed to prove that the killing of victim Farris was at random and without apparent motive. These issues are addressed and resolved by the court in the section of this opinion pertaining to appellant Greene.

the sound discretion of the trial court, and it is the court's duty to strike a balance between probative value and its prejudicial dangers. Petrocelli v. State, 101 Nev. 46, 52, 692 P.2d 503, 508 (1985).

We conclude that Souza's testimony does not constitute improper prior bad act evidence as Greene contends. The prosecutor's elicitation of Souza's testimony that Greene was not finished "killing" is admissible as evidence of Greene's conspiracy with Winfrey to commit murder, one of the charges against him. If this evidence was improper for any reason, Greene received the benefit of a jury admonishment and therefore, there is no error.

Greene also contends that other testimony given by Souza was improper witness intimidation evidence because "the prosecutor obviously intended to imply to the jury that Greene was the source of the threat to Souza's parents." Greene asserts that there is no evidence to corroborate such an implication.

A prosecutor's references to or implications of witness intimidation by a defendant is reversible error unless the prosecutor also produces substantial credible evidence that the defendant was the source of the intimidation. Lay v. State, 110 Nev. 1189, 1193-94, 886 P.2d 448, 450-51 (1994).

Greene's argument that Souza's testimony that his parents were "scared" qualifies as evidence of witness intimidation by Greene is tenuous. At worst, this constitutes a single, indirect reference to witness intimidation by Greene. Moreover, there is no implication that Souza was reluctant to testify because of fear of retaliation by Greene. After listening to Souza's testimony, one might even reach the conclusion that Souza's parents are scared of Souza himself. Accordingly, we conclude that even if this qualifies as improper witness intimidation evidence, it is harmless beyond a reasonable doubt. Id., 886 P.2d at 450-51.

*Impeachment of witness Heather Barker*

Greene contends that the district court erred in prohibiting defense counsel from questioning witness Heather Barker concerning her testimony in a prior unrelated case. Greene asserts that Barker's "drug usage and lying under oath about drug usage are both highly relevant to the truthfulness of a witness." Greene

argues that the evidence is admissible pursuant to NRS 50.085(3).[3]

In the prior unrelated case, Barker had been asked whether she had taken any drugs before giving testimony, to which she answered no. She subsequently consented to a urine test. The positive results of that test revealed some level of controlled substance in her system. The district court in the prior case sealed Barker's test results, and the type and amount of controlled substance in her system was never revealed. In the instant case, Greene wanted to impeach Barker with her testimony in that prior case. The district court ruled that defense counsel could question Barker about her drug use as it related to her current testimony, but not to her testimony in the prior case.

The decision to admit evidence is within the sound discretion of the court. Daly v. State, 99 Nev. 564, 567, 665 P.2d 798, 801 (1983). In Rembert v. State, 104 Nev. 680, 683, 766 P.2d 890, 892 (1988), this court held that it was error to allow the State to attempt to impeach a defendant's credibility with extrinsic evidence relating to a collateral matter. *Accord* Rowbottom v. State, 105 Nev. 472, 485, 779 P.2d 934, 942 (1989). Further, "[e]ven where relevancy . . . may be found, fair trial demands that the evidence not be admitted in cases where, by virtue of its prejudicial nature, it is more likely to distract from the essential issue than bear upon it." State v. Nystedt, 79 Nev. 24, 27, 377 P.2d 929, 931 (1963) (quoting Nester v. State, 75 Nev. 41,54, 534, 531 (1959)).

We conclude that, under the circumstances of this case, the district court properly determined that any testimony regarding whether Heather Barker lied about using drugs or actually had drugs in her system at the prior unrelated trial was collateral. It was sufficient that defense counsel was permitted to question Barker concerning her drug use on the night of the murders and prior to testifying in the instant case. The district court did not abuse its discretion in prohibiting defense counsel from impeaching Barker regarding a collateral matter.

---

[3]NRS 50.085(3) provides:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime, may not be proved by extrinsic evidence. They may, however, if relevant to truthfulness, be inquired into . . . on cross-examination of a witness who testifies to an opinion of his character for truthfulness or untruthfulness, subject to the general limitations upon relevant evidence.

*Admission of victim photographs*

Greene contends that the district court erred by admitting victim photographs because they were more prejudicial than probative. Greene asserts that because the same photographs had made a juror ill at Winfrey's trial, the district court had advance notice of the photographs' inflammatory nature and therefore, it should not have permitted their introduction.

[Headnote 8]

The admissibility of photographs is within the sound discretion of the trial court, whose decision will not be disturbed in the absence of a clear abuse of that discretion. Paine v. State, 110 Nev. 609, 617, 877 P.2d 1025, 1029 (1994), *cert. denied,* 115 S. Ct. 1405 (1995). It is within the court's discretion to admit photographs where the probative value outweighs any prejudicial effect the photographs might have on the jury. Ybarra v. State, 100 Nev. 167, 172, 679 P.2d 797, 800 (1984), *cert. denied,* 470 U.S. 1009 (1985).

After reviewing the photographs, we conclude that the district court did not abuse its discretion by admitting them. The three photographs submitted to this court with the record on appeal are far from graphic. Two photographs are aerial views of the crime scene; the only photo of the two dead bodies shows them from a considerable distance. The third photograph is a picture of a young woman, presumably Deborah Farris, when she was alive. These photographs are more probative than prejudicial and there was no error.

*Jury instructions regarding homicide*

Greene contends that the jury instructions regarding homicide were improper because the terms premeditated, deliberate and willful were not clarified for the jury. Greene asserts that these three terms constitute ''necessary and distinct elements to the crime of First Degree Murder. The use of the conjunctive 'and' crystallizes that the elements are separate and each one is required to support a verdict of murder in the first degree.'' Greene claims that because these terms were not defined separately, the distinction between first and second degree murder was not clear to the jury.

Jury instructions relating to intent must be read together, not disconnectedly, and a single instruction to the jury may not be

judged in isolation, but must be viewed in context of the overall charge. Rose v. State, 86 Nev. 555, 558, 471 P.2d 262, 264 (1970).

In Powell v. State, 108 Nev. 700, 838 P.2d 921 (1992), *overruled on other grounds*, 511 U.S. 79 (1994), this court reiterated that premeditation and deliberation constitute a single term and not separate elements requiring separate thought processes. *Id.* at 708, 838 P.2d at 926-27 (citing Briano v. State, 94 Nev. 422, 581 P.2d 5 (1978)). After reviewing the law in other jurisdictions, this court further concluded that the terms premeditated, deliberate and willful are a single phrase, meaning simply that the actor intended to commit the act and intended death as the result of the act. *Id.* at 709, 838 P.2d at 927.

In the instant case, we conclude that the jury instructions regarding homicide comport with the law. The requirements for first-degree murder were clearly outlined, and the distinction between first- and second-degree murder was explicit. Thus, Greene's contention that the jury instructions were improper lacks merit.

*Prosecutorial misconduct during the state's opening statement at the guilt phase*

Greene contends that the prosecutor committed misconduct during the opening statement by making the following remarks:

> Prior to going to Leonard Winfrey's apartment and after the killing of this young couple this defendant laughed while in that Camaro. He laughed about how the man looked when his eye popped out after he was shot and killed, and he laughed about how Deborah Farris looked with the blood gushing from her neck. This defendant thought what he had done on Sunrise Mountain was funny. He laughed about it. He laughed about it with Leonard Winfrey. He was so excited, he was having so much fun shooting that mini-14 assault rifle. This was fun for this defendant.
>
> MR. SCHIECK [defense counsel]: Your Honor, I'm going to object. This is argument, not opening statement.
>
> THE COURT: Overruled.
>
> . . .
>
> And what Heather had seen was horrible, it was brutal, and it was done for no reason.
>
> MR. SCHIECK: Going to object, Your Honor. This is argument, Your Honor.
>
> THE COURT: Sustained.
>
> MR. SCHWARTZ [prosecutor]: This defendant killed

two innocent people for absolutely no reason, just for the hell of it.

MR. SCHIECK: Your Honor, again I'm going to object. This is argument.

THE COURT: Keep it to what the evidence will show, Mr. Schwartz.

. . .

Their lives came to an abrupt end because of the selfishness and cold-bloodedness of that individual.

MR. SCHIECK: Going to object, Your Honor. Again, this is argument. And ask the jury be admonished.

THE COURT: Sustained.

MR. SCHWARTZ: . . . Two innocent people were killed on September 23, 1994. And someone said that the killing of an innocent person is the ultimate evil. The evidence in this case will show that on September 23, 1994, this defendant committed the ultimate evil, not once, but twice.

MR. SCHIECK: Going to object again, Your Honor. This is improper opening statement.

THE COURT: Sustained. Ladies and gentlemen, arguments of counsel are not evidence, as I've told you earlier, and neither are the personal beliefs of counsel as to—as to the implications of that evidence.

Greene asserts that the prosecutor "engaged in prejudicial, passionate and improper argument to the jury under the guise of an opening statement. The impact of this argument infected the entire proceeding and violated Greene's right to due process and a fair trial."

"[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." United States v. Young, 470 U.S. 1, 11 (1985). In addition, should this court determine that improper comments were made by the prosecutor, "it must be . . . determined whether the errors were harmless beyond a reasonable doubt." Witherow v. State, 104 Nev. 721, 724, 765 P.2d 1153, 1155 (1988). The Constitution guarantees a fair trial, not necessarily a perfect trial. Ross v. State, 106 Nev. 924, 927, 803 P.2d 1104, 1105 (1990). It is not enough that the prosecutor's remarks are undesirable. Darden v. Wainwright, 477 U.S. 168, 181 (1986). Thus, the relevant inquiry is whether the prosecutor's statements so infected the proceedings with unfairness as to make the results a denial of due process. *Darden,* 477 U.S. at 181.

We conclude that the prosecuting attorney's remarks did not rise to the level of improper argument that would justify overturning the conviction. The only patently improper statement is the reference to the "selfishness and cold-bloodedness" of Greene. A prosecutor has the duty to refrain from stating facts in opening statement that he cannot prove at trial. *Lord v. State,* 107 Nev. 28, 32, 806 P.2d 548, 551 (1991). None of the other statements are manifestly improper or constituted misconduct. As to the first set of remarks, the prosecutor did show that the murders were committed for no reason, *i.e.,* without any apparent motive. As to the last remark, the prosecutor did later prove that Greene committed murder, "the ultimate evil," not once, but twice. Further, the defense received the benefit of a jury admonishment, which, in this instance, is sufficient to remove any prejudice. Moreover, even if this court concluded that the above-referenced statements constituted prosecutorial misconduct, such misconduct was harmless beyond a reasonable doubt in light of the overwhelming evidence of guilt against Greene. *See Lay,* 110 Nev. at 1193-94, 886 P.2d at 450-51.

However, this court cannot condone the prosecutor's behavior during his opening statement. He ignored the district judge's repeated admonitions to confine the State's opening remarks to what the evidence would show and to refrain from injecting personal beliefs into his statement. All attorneys making presentations before the courts of law of this state have a solemn duty to respect admonitions issued by members of the bench and may be disciplined for ignoring such rulings. *See* SCR 39; SCR 99. As representatives of the state, prosecutors have a special, heightened duty of fairness and responsibility, particularly in capital cases. *See* Emerson v. State, 98 Nev. 158, 164, 643 P.2d 1212, 1215-16 (1982) (citing Berger v. U.S., 295 U.S. 78, 88 (1935)); SCR 173; SCR 250. We issue a stern warning to trial attorneys that improper opening statements and failure to observe the admonitions of the trial judge will not be tolerated and that this court will act whenever appropriate to deter such breaches of conduct. We fine the prosecutor $250 for his improper behavior. *See* SCR 39; SCR 99; SCR 102; Young v. District Court, 107 Nev. 642, 818 P.2d 844 (1991).

*Prosecution misconduct during the closing statement of the guilt phase*

Greene contends that the prosecutor committed misconduct

during the closing statement at the guilt phase of Greene's trial by stating:

> What is shown in these photographs that I showed you a moment ago caused this defendant to laugh and to drive away from the crime scene; this is what caused the defendant to laugh and joke about the condition of the poor man's eye and the condition of Deborah Farris. Defendant found this funny. The family of Deborah Farris isn't laughing, and the family of Christopher Payton isn't laughing.
>
> MR. SCHIECK: I'm going to object, Your Honor, to —
>
> THE COURT: Sustained.

Greene argues that the prosecutor improperly referred to victim impact evidence with this statement.

These statements do not constitute victim impact evidence. The prosecutor did not refer to the effects of the murders on the victims' families and how much they are grieving their losses. Here, the prosecutor's statement is a rhetorical comparison relating to Greene's complete lack of remorse and lack of value for human life. It does not rise to the level of improper argument as Greene contends. Further, even if the statement amounted to prosecutorial misconduct, it is harmless beyond a reasonable doubt. *Young,* 470 U.S. at 11; *Lay,* 110 Nev. at 1194, 886 P.2d at 451.

*Whether NRS 200.033(12) is facially constitutional and constitutional as applied in Greene's case*

Greene contends that NRS 200.033(12) is unconstitutionally vague and ambiguous because it cannot be differentiated from NRS 200.033(2).

NRS 200.033 states in pertinent part:

> The only circumstances by which murder of the first degree may be aggravated are:
>
> 2. The murder was committed by a person who was previously convicted of another murder or of a felony involving the use or threat of violence to the person of another.
>
> . . .
>
> 12. The defendant has, in the immediate proceeding, been convicted of more than one offense of murder in the first or second degree. For the purposes of this subsection, a person shall be deemed to have been convicted of a murder at the time the jury verdict of guilt is rendered or upon pronouncement of guilty by a judge or judges sitting without a jury.

In fact, the difference between NRS 200.033 subsections 2 and 12 is readily apparent. Under subsection 2, any convictions for murders or crimes of violence *in previous proceedings* can be properly admitted to aggravate first degree murder. Hogan v. Ely State Prison, 109 Nev. 952, 956-57, 860 P.2d 710, 714 (1993), *cert. denied,* ........ U.S. ......, 117 S. Ct. 334 (1996); Riley v. State, 107 Nev. 205, 217, 808 P.2d 551, 558 (1991), *cert. denied,* 514 U.S. 1052, 115 S. Ct. 1431 (1995). On the other hand, subsection 12 aggravates first degree murder where the accused is convicted of more than one murder *in the instant proceeding.* Thus, we conclude that Greene's claim that NRS 200.033(12) is unconstitutional is meritless.

Further, we also conclude that NRS 200.033(12) was constitutional as applied in this case. Greene was convicted of the murders of both Farris and Payton and therefore, "in the immediate proceeding, [he has] been convicted of more than one offense of murder in the first or second degree." Thus, there is sufficient evidence to support this aggravator.[4]

*The constitutionality of the "at random and without apparent motive" aggravator of NRS 200.033(9)*

Greene contends that NRS 200.033(9), the "at random and without apparent motive" aggravating factor for murder, is unconstitutional. He argues that it is vague and ambiguous, and that it violates the Fifth and Eighth Amendments.

NRS 200.033(9) provides that one of the circumstances by which a first degree murder may be aggravated is that the "murder was committed upon one or more persons at random and without apparent motive." A state authorizing capital punishment has a constitutional duty to tailor its law to avoid the arbitrary and capricious infliction of the death penalty. Godfrey v. Georgia, 446 U.S. 420, 428 (1980). We have examined the constitutionality of the death penalty statute as a whole:

> Nevada's capital punishment law was amended in 1977 with inconsequential revision from the death penalty statutes in Georgia and Florida. Georgia and Florida statutes survived constitutional scrutiny by the United States Supreme Court and satisfied the constitutional deficiencies enunciated in *Furman.* Gregg v. Georgia, 428 U.S. 153, 196-207 (1976); Profitt v. Florida, 428 U.S. 242, 251-53 (1976).

---

[4]For the same reasons, we also conclude that NRS 200.033(12) was constitutional as applied to Winfrey.

Deutscher v. State, 95 Nev. 669, 676, 601 P.2d 407, 412 (1979), *vacated on other grounds,* 500 U.S. 901 (1991). This court has also upheld the constitutionality of NRS 200.033(9), as applied, on numerous occasions. *See, e.g.,* Lane v. State, 110 Nev. 1156, 881 P.2d 1358 (1994); Paine v. State, 110 Nev. 609, 877 P.2d 1025 (1994), *cert. denied,* 514 U.S. 1038, 115 S. Ct. 1405 (1995); Moran v. State, 103 Nev. 138, 734 P.2d 712 (1987); Ford v. State, 102 Nev. 126, 717 P.2d 27 (1986). Because Nevada's death penalty scheme as a whole is facially constitutional, and NRS 200.033(9) is not arbitrary and capricious as applied in the instant case, we conclude that Greene's argument is without merit.

> *Sufficient evidence to support the jury's finding that Farris's murder was committed at random and without apparent motive pursuant to NRS 200.033(9)*

Greene contends that there was insufficient evidence for the jury to find that the killing of Deborah Farris was at random and without apparent motive in light of the Winfrey jury's finding that the same aggravator did not exist for the killing of Christopher Payton.

In Bollinger v. State, 111 Nev. 1110, 901 P.2d 671 (1995), this court affirmed inconsistent verdicts as valid. In *Bollinger,* the jury had found Bollinger guilty of committing two simultaneous murders, but then determined that the aggravating circumstance that Bollinger was under sentence of imprisonment at the time he committed the murders only existed as to one of the murders. *Id.* at 1116-17, 901 P.2d at 675-76. This court held, "the jury could have properly concluded as it did to extend a form of clemency. We conclude that the rationale . . . should apply in sentencing as well." *Id.* at 1117, 901 P.2d at 676; *see also* Dunn v. United States, 284 U.S. 390 (1932) (holding that consistent verdicts on separate counts are not required); Brinkman v. State, 95 Nev. 220, 592 P.2d 163 (1979).

Although inconsistent verdicts are permitted, the Winfrey jury's finding of the at random and without apparent motive aggravator as to Farris's murder, but not Payton's murder, is not necessarily inconsistent. Here, Greene had already shot Payton at the time Winfrey jumped out of the car. Winfrey did not try to shoot Payton, but then did attempt to kill Farris. Perhaps, the jury extended clemency to Winfrey by failing to find this aggravator because Winfrey did not attempt to kill Payton. Nevertheless,

even if the Winfrey jury's findings are inconsistent, the inconsistency does not negate the finding of randomness for Farris's murder by either the Winfrey jury or the Greene jury.

We conclude that sufficient evidence exists to support both the Greene and the Winfrey juries' findings that Farris's murder was committed at random and without any apparent motive. In this case, Greene decided to see how big a hole the M-14 assault rifle would make in "something." Winfrey accompanied Greene as they embarked on a course of conduct that resulted in the killing of Christopher Payton and Deborah Farris. Other than Greene's interest in seeing how big a hole the M-14 assault rifle would make in something, the facts do not evidence any apparent motive for the killing of these two innocent victims.[5]

### Cumulative error requiring a new trial

Relying upon Sipsas v. State, 102 Nev. 119, 716 P.2d 231 (1986), Greene asserts that cumulative error requires reversal and remand for a new trial.

Where the accumulation of error is more serious than an isolated breach, it may result in the denial of the constitutional right to a fair trial. *Id.* at 125, 716 P.2d at 234. There was no accumulated error resulting in the denial of a fair trial in the proceedings below. Greene received a fair and unprejudiced trial by his peers comporting with constitutional requirements. Thus, Greene's contention lacks merit.

In cases in which the death penalty is imposed, this court is also statutorily required to consider whether the death sentence was imposed under the influence of passion, prejudice, or any arbitrary factor and whether the sentence of death is excessive considering both the crime and the defendant. NRS 177.055(2). We conclude that the death sentence of Greene was not imposed under the influence of passion, prejudice, or any arbitrary factor, nor was it excessive in this case considering the senseless and violent nature of the crime and the defendant.

### Winfrey's appeal

#### Witness Barker as a co-conspirator

On appeal, Winfrey contends that Heather Barker was a

---

[5]We reject Winfrey's argument on the same issue based upon the same grounds.

co-conspirator. Based upon this premise, Winfrey argues that Barker should not have been allowed to testify without the advice of an attorney or a grant of immunity. Because of these alleged constitutional violations, Winfrey asserts that Barker's testimony should have been stricken from the record.

"An accomplice is one who is liable to prosecution for the identical offense charged against the defendant, NRS 175.291(2), or who is culpably implicated in, or unlawfully cooperates, aids or abets in the commission of the crime charged." Orfield v. State, 105 Nev. 107, 109, 771 P.2d 148, 149 (1989) (citation omitted). "Moreover, it is hornbook law 'that conduct, to be criminal, must consist of something more than mere action (or non-action where there is a legal duty to act); some sort of bad state of mind is required as well.' " Id., 771 P.2d at 149 (quoting W. LaFave & A. Scott, Criminal Law 176 (1972)).

Winfrey cites to the following facts to support his position that Barker was a co-conspirator: (1) she did not immediately go to police after witnessing the murders; (2) she knew that Greene and Winfrey possessed weapons at the time of the offense since the guns had been discharged before they drove to the crime scene; (3) she took temporary possession of the handgun after the shooting; (4) she knew one of the victims; (5) she knew the car was stolen; and (6) she provided Greene with a rag which he used to clean the weapon after the murder.

After reviewing Barker's testimony, this court concludes that Winfrey's contention clearly lacks merit. Despite Winfrey's colorful analysis of Barker's involvement in the crime, none of the aforementioned facts are convincing evidence of her participation in the conspiracy. Our review indicates that Barker was an innocent bystander to the whole chain of events. Barker had no idea when she asked for a ride home from Greene and Winfrey that she would be a witness to two murders. The facts that Barker failed to go to the police, took temporary possession of the handgun while seated in the car after the murders, and provided a rag to clean the handgun do not make her an accomplice. Barker's testimony demonstrates that she was frightened by the crimes, she did as she was told, and she kept quiet out of fear. Further, Barker later learned the identity of the two victims and indeed, Farris and Payton were her friends. Our review of the record evinces that Winfrey and Greene came upon Farris and Payton by chance, and Barker is in no way responsible for this tragic coincidence. Moreover, we point out that Barker was never charged with any involvement in the crime.

Further, Winfrey has waived any right to challenge Barker's testimony because he failed to raise a timely objection prior to or

during her testimony. "When an appellant fails to specifically object to questions asked or testimony elicited during trial, but complains about them, in retrospect upon appeal, we do not consider his contention a proper assignment of error." Wilson v. State, 86 Nev. 320, 326, 468 P.2d 346, 350 (1970).

Moreover, the thrust of Winfrey's argument on appeal is that Barker's constitutional rights were violated. Winfrey has no standing to assert this challenge. Constitutional rights are personal and may not be asserted vicariously. Broadrick v. Oklahoma, 413 U.S. 601, 610 (1973). Thus, we conclude that Winfrey's contention lacks merit.

### Prosecution misconduct during the State's closing argument at the guilt phase

Winfrey contends that the prosecutor committed misconduct during the State's closing argument at the guilt phase of his trial. Winfrey alleges that there were four separate episodes of prosecutorial misconduct; however, his brief on appeal is not explicit as to which statements he found objectionable.

First, Winfrey contends that the prosecutor misstated the law of intent. His complete analysis is as follows: "The prosecutor in the instant case made analogies with this case to a robbery. This is not a felony murder case. Based on the aforementioned statement, the prosecutor committed misconduct."

In a quite long-winded fashion, the prosecutor explained the instructions to the jury by giving an appropriate example of when an aider or abettor may be liable for murder, even when that aider or abettor did not pull the trigger himself. Although the prosecutor used a robbery as an example, he did not misstate the law of intent. For these reasons, we conclude that the prosecutor's statements were not confusing to the jury and they in no way constitute misconduct. Second, Winfrey asserts, "The prosecutor in the case at bar argued facts not in evidence. He mentioned Winfrey as an accomplice in a burglary which the trial court ruled was only admissible as to Greene. This is the type of abuse from the State's attorney which warrants a new trial."

The prosecutor summarized the testimony of two witnesses regarding the stealing of the guns:

> Chris Girlie and Lance Strickland, they testified, and they talked about the burglary of Mr. Izzard's house and how they stole those weapons there. And no doubt counsel for defense is going to talk about a deal that was made with

regard to these two individuals that they weren't prosecuted for that burglary. Now what's interesting is both Girlie and Strickland were involved in the burglary of Mr. Izzard's trailer, but only Girlie actually entered the trailer with Greene. But, Strickland is equally accountable for what went on inside that trailer, because he was a aider and abettor and he was a co-conspirator.

The prosecutor did not imply that Winfrey was involved in the stealing of the guns; therefore, he did not argue facts not in evidence. Rather, he was presenting another example of how an aider and abettor may be held fully accountable for a crime even though he did not personally commit any of the acts constituting the crime. We conclude that this statement did not constitute prosecutorial misconduct.

Third, Winfrey contends that the prosecutor improperly referred to victim impact evidence during the guilt phase of the trial:

This is how Winfrey and Greene got their excitement on September 23, 1994. This is what Defendant Leonard Winfrey couldn't wait to do again. These photographs are what caused Greene and Winfrey to laugh, joke, to laugh about how Deborah Farris looked after she was killed and how Chris Payton looked when he was shot in the head. His head was blown off. His eyeball was blown off. They laughed about it, they joked about it while they were in the car. This defendant and Travers Greene thought this was funny. *Chris Payton's family isn't laughing, Deborah Farris's family isn't laughing;* but both Winfrey and Greene were laughing about what they did to that poor couple.

These references to the victims' families do not constitute victim impact evidence. There was undisputed testimonial evidence that Greene and Winfrey were laughing about the crime and the victims as they drove away from the crime scene. "During closing argument, trial counsel enjoys wide latitude in arguing facts and drawing inferences from the evidence." Jain v. McFarland, 109 Nev. 465, 476, 851 P.2d 450, 457 (1993). Here, the prosecutor was simply comparing the effect of the crime on Greene and Winfrey, who laughed, with the victims' families, who presumably are not laughing. Accordingly, we conclude that the prosecutor did not exceed the scope of proper argument and there is no misconduct.

Fourth, Winfrey contends that the prosecutor made improper reference to punishment during closing argument:

You heard for the first time during this trial that Defendant Winfrey pled guilty to possession of stolen vehicle. And for some reason that bolsters his credibility before you as he sat there and looked at you and testified. And somehow just because a person pleads guilty, then we are to assume that he is an honorable person he'd plead guilty to everything that he was guilty of. I suggest to you that that's a ruse.

*But we don't execute people for being in possession of stolen vehicles.* The consequences aren't nearly as severe that he waited one year before he entered this plea. Is it a tactic? Is it a ploy? I suggest to you that his credibility is not bolstered by the fact that he pled guilty to possession of a stolen vehicle.

We point out that the prosecutor made these statements during the State's rebuttal argument and therefore, they were in response to issues raised by the defense in its closing argument. The strongest factor against reversal on the grounds that the prosecutor made an objectionable remark is that it was provoked by defense counsel. Pacheco v. State, 82 Nev. 172, 179, 414 P.2d 100, 104 (1966). Thus, the reference to Winfrey's guilty plea for the possession of stolen vehicle charge is not misconduct.

Further, the prosecutor's remark that death is not a possible punishment for possession of a stolen vehicle is simply a statement of fact and not improper. This court has held that it is proper to discuss general theories of penology during closing argument. Jimenez v. State, 106 Nev. 769, 772, 801 P.2d 1366, 1368 (1990).

In sum, we conclude that the prosecutor did not engage in any misconduct during closing argument of the guilt phase of Winfrey's trial.

### Admission of victim impact testimony

Winfrey contends that the district court erred in allowing Mrs. Hancock, Deborah Farris's mother, to testify at the penalty phase regarding the impact of Christopher Payton's murder on his family.

After describing the impact her daughter Deborah's death has had on her and her family, Hancock stated:

I'd kind of like to talk a little bit about Christopher. And his mother had written a letter and I've reviewed it a bit. She experiences the same aspects of not being able to find ambition or any joy in life. To see a funeral go by, she cries; to see children playing, she gets lost. She—Christopher lost her—his sister almost a year ago from the date that he was

killed. So not only has she lost one child, but she now has lost two; and there are no children in that family anymore. She was the only mother, so Christopher's grandma has no grandchildren anymore, they're all gone.

During Hancock's victim impact statement, the defense did not raise any objection. Later, the defense made a motion to strike her testimony and in the alternative motioned for a mistrial or a new penalty hearing after the statement and the relevant photographs had been properly admitted into evidence. Defense counsel stated that it did not raise a contemporaneous objection, because "it was a situation where I couldn't just jump up and make the objection at the time." The district court denied the motion.

Victim impact evidence is relevant to the jury's decision as to whether or not the death penalty should be imposed. Homick v. State, 108 Nev. 127, 136, 825 P.2d 600, 606 (1991), *petition for cert. filed,* (U.S. July, 3, 1996) (No. 96-5714). Here, Hancock read the letter Christopher Payton's mother had written regarding the impact of his murder on that family and referred to it during her own testimony. We conclude that admission of Hancock's testimony regarding the impact of Payton's murder on his family does not constitute error. *Id.* at 136, 825 P.2d at 606; *see also* Payne v. Tennessee, 501 U.S. 808 (1991).

*Prosecution misconduct during the State's closing argument at the penalty phase of Winfrey's trial*

Winfrey contends that the prosecutor improperly referred to Winfrey's "future dangerousness" to assert that the death penalty is an appropriate punishment for the crimes at issue.

This court has held that the prosecutor may argue the future dangerousness of a defendant even when there is no evidence of violence independent of the murder in question. Redmen v. State, 108 Nev. 227, 235, 828 P.2d 395, 400 (1992), *overruled on other grounds by,* Alford v. State, 111 Nev. 1409, 906 P.2d 714 (1995). However, "psychiatric evidence purporting to predict the future dangerousness of a defendant is highly unreliable and, therefore, inadmissible at death penalty sentencing hearings." *Id.* at 234, 828 P.2d at 400. It was error for the prosecutor to argue that because Dr. Kinsora characterized Winfrey as a thrill seeker, Winfrey would pose a future threat by breaking out of prison. Nevertheless, in light of the fact that Winfrey did not receive death sentences for the murders, but life sentences without the

possibility of parole, we conclude that this error was harmless beyond a reasonable doubt.

Accordingly, the conviction and sentence of appellant Winfrey are also affirmed.

STEFFEN, C. J., and YOUNG and ROSE, JJ., concur.

SPRINGER, J., concurring:

I concur in the result reached in the majority opinion, but I disagree with the majority's sanction of Mr. Schwartz in the measly sum of $250.00.

First, I want to say that it was clearly incumbent upon the trial judge to put a stop to Mr. Schwartz' contemptuous refusal to abide by the court's rulings relative to his impermissible rhetorical argument during his opening statement. Had the trial judge declared a mistrial and sanctioned Mr. Schwartz at the time of his misconduct this court would not be faced with having to decide whether this clearly guilty murderer is entitled to a new trial by reason of the most blatant prosecutorial misconduct that I have seen in a long time. Given the unfortunate place that Mr. Schwartz has placed this court in, the assessment of $250.00 is laughable. I think $2,500.00 is more like it, or perhaps even more.