KITRICH POWELL, Appellant, v. THE STATE OF NEVADA, Respondent.

No. 22348

September 3, 1992          838 P.2d 921

[Rehearing denied February 23, 1993]

*Lee Elizabeth McMahon,* for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Rex Bell,* District Attorney, *James Tufteland,* Chief Deputy District Attorney, and *Daniel M. Seaton,* Deputy District Attorney, Clark County, for Respondent.

## OPINION

*Per Curiam:*

A jury convicted appellant Kitrich Powell (Powell) of first degree murder in the death of four-year-old Melea Allen (Melea). Powell had subjected the child to repeated beatings which resulted in a variety of injuries, one of which caused her death. Powell was sentenced to death following a penalty hearing. For the following reasons, we affirm both the conviction and the sentence.

### Facts

Powell met Sharon Allen and her three children in September 1989 at a Salvation Army shelter in Las Vegas, Nevada. The Allens and Powell then moved in and out of several apartments and motels for the next two months. During this period, Mrs.

Allen worked at Deseret Industries from 8:30 a.m. until 5:00 p.m. Powell stayed home and took care of Melea while the older children were at school and Mrs. Allen was at work.

Neighbors noticed that Melea had bruises on her face and legs, a cut chin and that one of her eyes was quite red. On one occasion, a neighbor heard Melea screaming and crying. When he saw Melea approximately one and one-half hours later, he noticed new bruises on her face and legs which had not been there the night before. In the neighbor's presence, Powell asked Melea how she had gotten hurt, and she answered: "Daddy, you did it." Powell then said, "No, baby, remember you fell in the tub, remember?" Powell and Melea repeated this conversation a couple of times.

The testimony at trial indicated that Powell cruelly teased Melea and mistreated her physically in the presence of others. On the evening of November 2, 1989, Melea was quiet and inactive. She could not move her head and was complaining of head and neck pain. The left side of her head was soft and spungy, and she had a new bruise on her forehead. She told her mother and siblings that "Daddy" (Powell) had dropped her on her head when he was lifting her over his shoulder. Melea was not taken to a hospital by either Powell or Mrs. Allen on the day these new injuries occurred.

The next morning, November 3, 1989, Melea could not hold up her head and could not walk without assistance. Mrs. Allen went to work as usual, and Powell delayed seeking medical treatment for Melea until late that morning. By the time Melea was admitted to the emergency room of the hospital, she was unconscious and in critical condition. An examination of the comatose child revealed a deep laceration on her chin, which was in the process of healing, and a number of bruises which were in different stages of healing. Melea's buttocks showed a pattern of several injuries on top of one another. She had extensive bruising all over her body and her spine was fractured. Melea's head showed evidence of several injuries. The most recent and severe injury had caused her brain to swell and was the cause of the coma. Melea's head injury was most likely caused by a blunt trauma which carried considerable force. The State's expert witness, Dr. Richard Krugman, testified that in the last three years he had seen only one head injury which was similar to Melea's. That injury resulted from an adolescent being propelled off the top of a pickup truck at forty-five miles per hour onto a concrete surface. Melea's injuries suggested a repetitive pattern of daily injury. All three physicians who testified agreed that Melea's injuries were not the result of accidents and that Melea had been subjected to severe abuse for some time. Without regaining

consciousness, Melea died from the head injury on November 8, 1989.

Originally, Powell was arrested and charged with child abuse with substantial bodily harm (NRS 200.508). Shortly after Melea's death, Powell was additionally charged with murder (NRS 200.010; NRS 200.030). Following a jury trial, Powell was found guilty of murder in the first degree. Following a penalty hearing, the jury imposed a sentence of death. This appeal followed. On appeal, Powell asserts several assignments of error, which we now address.

### Delay in Appearing Before a Magistrate

Powell argues that he was not brought before a magistrate within seventy-two hours as required by NRS 171.178(3). NRS 171.178(3) provides:

> 3. If an arrested person is not brought before a magistrate within 72 hours after arrest, excluding nonjudicial days, the magistrate:
> (a) Shall give the prosecuting attorney an opportunity to explain the circumstances leading to the delay; and
> (b) May release the arrested person if he determines that the person was not brought before a magistrate without unnecessary delay.

The purpose of NRS 171.178 is to prevent the police from resorting to secret interrogations and coercive tactics. Huebner v. State, 103 Nev. 29, 32, 731 P.2d 1330, 1333 (1987). This court has repeatedly held that the defendant must show prejudice which resulted from the delay. See e.g., Id. at 32, 731 P.2d at 1333; Morgan v. Sheriff, 92 Nev. 544, 546, 554 P.2d 733, 734 (1976).

Powell was arrested on Friday, November 3, 1989. A magistrate found probable cause to hold Powell for a preliminary hearing on Tuesday, November 7, 1989. It is unclear from the record whether Powell was present before the magistrate on this day. Powell contends that he was not brought before a magistrate until November 13, 1989. On November 3, 1989, and November 7, 1989, prior to his initial appearance, Powell made statements to the police. He admitted to spanking Melea for wetting her pants and slapping her on other occasions. Powell told officials that he never intended to hurt "the baby." These statements, which were presented to the jury, were clearly prejudicial to Powell.

We initially note that the United States Supreme Court has provided additional guidance on the issue of what constitutes a timely initial appearance. See County of Riverside v.

McLaughlin, 111 S.Ct. 1661 (1991). In *McLaughlin,* the Court stated that the Fourth Amendment allows for a reasonable delay of a probable cause determination while authorities are processing suspects through the criminal justice system. *Id.* at 1669. The Court then went on to state that a judicial determination of probable cause within forty-eight hours of arrest comports with the promptness requirement set forth in Gerstein v. Pugh, 420 U.S. 103 (1975). *McLaughlin,* 111 S.Ct. at 1670. Intervening weekends (and implicitly, holidays or other non-judicial days) are included in the calculation of forty-eight hours. *Id.* If the suspect does not receive a probable cause determination within forty-eight hours, the State must prove that the delay was due to a bona fide emergency or other extraordinary circumstances. *Id.*

The *McLaughlin* case renders NRS 171.178(3) unconstitutional insofar that it permits an initial appearance up to seventy-two hours after arrest and instructs that non-judicial days be excluded from the calculation of those hours. Based on *McLaughlin,* we hold that a suspect must come before a magistrate within forty-eight hours, including non-judicial days, for a probable cause determination.[1]

However, the analysis of whether or not Powell's rights were violated does not end with the mere facts of a delay and incriminating statements. We have previously held that an accused waives his right to a seasonal arraignment when he voluntarily waives his right to remain silent. Deutscher v. State, 95 Nev. 669, 601 P.2d 407 (1979), *vacated on other grounds,* 111 S.Ct. 1678 (1991). There, we stated:

> We subscribe to the rule of law which provides that when an accused voluntarily waives his right to silence and his right

---

[1]It is important to note that the forty-eight hour requirement mandated by *McLaughlin* does not apply to the case at hand. When a case announces a new rule of law, the application of the rule is prospective unless it is a rule of constitutional law; and then it is only applied retroactively under certain circumstances. Gier v. District Court, 106 Nev. 208, 212, 789 P.2d 1245, 1248 (1990). The factors to be weighed in determining retroactivity are: ''(1) the purpose of the rule; (2) the reliance on prior, contrary law; and (3) the effect retroactive application would have on the administration of justice.'' Franklin v. State, 98 Nev. 266, 269 n.2, 646 P.2d 543, 545 n.2 (1982) (citing Tehan v. United States, 382 U.S. 406 (1966)).

We conclude that the new rule announced in *McLaughlin* would not apply retroactively, if only for the monumental negative impact which retroactive application would have on the administration of justice in Nevada. Were *McLaughlin* to be applied retroactively, untold numbers of prisoners would be set free because they were not brought before a magistrate within forty-eight hours.

to counsel, he concurrently waives his right to be seasonably arraigned. The reason for this rule is that the primary purpose of an arraignment is to inform the defendant of his rights. But a delay in arraignment is not prejudicial when a defendant has already been advised of his rights, was promptly so advised, and voluntarily waived his rights. This is particularly so when the delay is not flagrant and the record is silent relative to any other irregularities which go to the issue of voluntariness.

*Id.* at 680, 601 P.2d at 414 (citations omitted).

Powell does not challenge the voluntariness of his statements, nor is there any indication in the record that the statements were involuntary. During the first interview on November 3, 1989, prior to being formally arrested, Powell left the interview twice in order to smoke a cigarette. Powell's conduct indicates that he felt free to leave the interview at any time and that he was not coerced or involuntarily detained in any way. On November 7, 1989, Powell was read his Miranda rights prior to the interview, and he waived those rights. There is no indication that the waiver was involuntary.

Irrespective of when Powell was brought before a magistrate, he waived his right to remain silent and his right to counsel. By waiving those rights, he thereby waived his right to a timely arraignment. *Deutscher,* 95 Nev. at 680, 601 P.2d at 414. The same reasoning this court employed in *Deutscher* applies to the requirement of an initial appearance before a magistrate within the prescribed time limit. At the initial appearance, Powell would have been advised, *inter alia,* of the right to counsel and the right to remain silent. NRS 171.186.[2] One of the purposes of a speedy arraignment is to ensure that the suspect is informed of his Fifth Amendment right against self-incrimination. Huebner v. State, 103 Nev. 29, 32, 731 P.2d 1330, 1333 (1987). The same is true of a timely first appearance. Powell was advised of his rights on November 7, 1989, when he gave a statement to the police, and he voluntarily waived those rights. We therefore conclude that by

---

[2]NRS 171.186 prescribes the rights of the defendant prior to a preliminary hearing. NRS 171.186 provides:

> The magistrate or master shall inform the defendant of the complaint against him and of any affidavit filed therewith, of his right to retain counsel, of his right to request the assignment of counsel if he is unable to obtain counsel, and of his right to have a preliminary examination. He shall also inform the defendant that he is not required to make a statement and that any statement made by him may be used against him. The magistrate shall allow the defendant reasonable time and opportunity to consult counsel, and shall admit the defendant to bail as provided in this Title.

waiving his right to remain silent and his right to counsel, Powell waived his right to an appearance before a magistrate within seventy-two hours.

## Evidence of a Prior Bad Act in the Guilt Phase

Melea's fourteen-year-old sister, Melinda, testified that prior to trial, Powell asked her to lie for him at trial and that he repeatedly made harassing phone calls to her. Powell told her that he had killed Melea and threatened Melinda by saying that she "was next." Prior to Melinda's testimony, defense counsel moved to exclude the statement regarding the threat, because it constituted proof of another crime. The State offered the statement as proof of Powell's intent to kill Melea. NRS 48.045(2).[3] The district court denied the motion, stating that there was no showing of unfair prejudice, confusion of the issues or misleading the jury if the testimony were allowed. The decision to admit or exclude evidence, after balancing the prejudicial effect with the probative value, is within the discretion of the trial judge. Petrocelli v. State, 101 Nev. 46, 52, 692 P.2d 503, 508 (1985); *see also* NRS 48.035(1) and (2).[4] The trial court's determination will not be overturned absent manifest error. *Petrocelli,* 101 Nev. at 52, 692 P.2d at 508.

We conclude that the district court did not abuse its discretion in allowing the threat to be presented to the jury. The testimony was admissible under NRS 48.045 as proof of intent to kill Melea, as well as the "complete story of the crime" doctrine. That doctrine provides that under certain circumstances, evidence of another crime may be introduced at trial when the other crime is interconnected to the act in question such that a witness cannot describe the act in controversy without referring to the

---

[3]NRS 48.045(2) provides:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

[4]48.035 Exclusion of relevant evidence on grounds of prejudice, confusion or waste of time.

1. Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury.

2. Although relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, waste of time or needless presentation of cumulative evidence. . . .

other crime. *See* NRS 48.035(3);[5] Cirillo v. State, 96 Nev. 489, 493, 611 P.2d 1093, 1095 (1980). The doctrine is applicable in this case. Here, Melinda could not describe Powell's admission that he had murdered Melea without describing the context in which the statement was made. Otherwise, the jury would have had no idea why Powell would "confess" to a fourteen-year-old child.

### Guilt Phase Jury Instructions on Willfulness, Deliberateness and Premeditation

Powell contends that the jury was not provided with an instruction defining "willful" or "deliberate" and that in the absence of such definitions, the jury was misled to believe that the State was only required to prove that Powell acted with premeditation.

Powell asserts that Jury Instruction No. 9 was incomplete because it merely defined premeditation. Jury Instruction No. 9 provided:

> Premeditation is a design, a determination to kill, distinctly formed in the mind at any moment before or at the time of the killing.
>
> Premeditation need not be for a day, an hour or even a minute. It may be as instantaneous as successive thoughts of the mind. For if the jury believes from the evidence that the act constituting the killing has been preceded by and has been the result of premeditation, no matter how rapidly the premeditation is followed by the act constituting the killing, it is willful, deliberate and premeditated murder.

Powell contends that this instruction directed the jury that if it found premeditation, it was to automatically find willfulness and deliberation as well.

In Briano v. State, 94 Nev. 422, 581 P.2d 5 (1978), this court referred to "deliberate and premeditated" as a single term and not separate elements requiring separate thought processes. We recently considered deliberateness in DePasquale v. State, 106 Nev. 843, 803 P.2d 218 (1990), *cert. denied*, 112 S.Ct. 99 (1991). There, we stated:

> Premeditation and deliberation can be inferred from the nature and extent of the injuries, coupled with repeated blows. Given the brutal and extensive nature of Mr. Cane's

---

[5]NRS 48.035(3) provides in relevant part:

> Evidence of another act or crime which is so closely related to an act in controversy or a crime charged that an ordinary witness cannot describe the act in controversy or the crime charged without referring to the other act or crime shall not be excluded . . . .

injuries (including injuries to the head, torso, ribs and back), an inference of premeditation and deliberation can be reasonably drawn. This is particularly true when considering the metal rod which was inserted deeply into the victim's ear. It is difficult to imagine such a process occurring without deliberate thought.

*Id.* at 848, 803 P.2d at 221. In *DePasquale,* as in *Briano,* we used the terms premeditated and deliberate as a single term.

Other jurisdictions have held that the terms deliberate, premeditated and willful are a single phrase, meaning simply that the actor intended to commit the act and intended death to result. *See* Sanders v. State, 392 So.2d 1280, 1282 (Ala.Crim.App. 1981) (the terms premeditation and deliberation may be grouped together under the phrase "formed design"); People v. Fusselman, 46 Cal.App.3d 289, 299 (Cal.Ct.App. 1975) (distinguishing malice aforethought from the phrase "willful, deliberate and premeditated"; the latter phrase indicates a frame of mind in which the actor weighs the course of action and chooses to kill); Fuller v. State, 413 A.2d 277, 280 (Md.Ct.Spec.App. 1980) (the trilogy of terms "willful, deliberate and premeditated" connote the same general idea of the intention to kill); Commonwealth v. Nelson, 523 A.2d 728, 732 (Pa. 1987) (a willful, deliberate and premeditated killing is one where the actor has specific intent to bring about the death of the victim). In *Fuller,* the Maryland Court of Special Appeals queried whether the three adjectives described three different aspects of the mental state of intent to kill or whether the terms were simply a rhetorical expression used for emphasis. *Fuller,* 413 A.2d at 280. The court went on to ask if the act could be willful (a specific design and purpose to kill) without simultaneously being deliberate (conscious knowledge of the purpose to kill). *Id.* We agree with the Maryland court when it stated: "The trilogy of terms connotes the same general idea—the intention to kill. The use of all three words would seem to us to serve no purpose other than to shroud the intention in an aura of redundancy so as to convey the seriousness of the matter." *Id.* at 380 (quoting Brown v. State, 410 A.2d 17, 22 (Md.Ct.App. 1979)).

We have set forth the requirement for premeditation in Briano v. State, 94 Nev. 422, 581 P.2d 5 (1978), where we stated "[T]he state must prove that a design to kill was distinctly and rationally formed in the mind of the perpetrator, at or before the time the fatal blows were struck. . . . [I]t [does not] matter how short a time existed between the formation of the design to kill and the killing itself." *Id.* at 425, 581 P.2d at 7. As long as the instruction on premeditation which is given to the jury comports with *Briano,* it is not necessary to separately define deliberateness or

willfulness. The instruction on premeditation which was given to the jury in the case at hand was an accurate definition. We therefore conclude that Powell's argument has no merit.

### Guilt Phase Instruction on What Constitutes Evidence of Willfulness, Premeditation and Deliberation

Powell takes exception to Jury Instruction No. 10, arguing that it constituted an impermissible comment on the evidence by the court because it instructed the jury what evidence it could consider to show willfulness and deliberateness. The instruction read: "The nature and extent of the injuries, coupled with repeated blows, may constitute evidence of willfulness, premeditation and deliberation."

This court has sanctioned a finding of premeditation and deliberation inferred from the circumstances of the killing in several cases. *See e.g.*, DePasquale v. State, 106 Nev. 843, 803 P.2d 218 (1990); Hern v. State, 97 Nev. 529, 635 P.2d 278 (1981); Curtis v. State, 93 Nev. 504, 568 P.2d 583 (1977). In fact, in *DePasquale*, this court used language nearly identical to the instruction about which Powell complains. There, we stated that "[p]remeditation and deliberation can be inferred from the nature and extent of the injuries, coupled with repeated blows." *DePasquale*, 106 Nev. at 848, 803 P.2d at 221. The jury instruction did not, therefore, constitute an impermissible comment on the evidence.

### Powell's Appearance in Shackles During the Penalty Phase

During both the guilt phase and the penalty phase of the trial, Powell exhibited disruptive and threatening behavior. The first outburst by Powell occurred during the guilt phase of the trial when one of the prosecutors informed the court that Powell had made derogatory remarks regarding a witness' sexual preference as the witness was walking to the stand. The judge declined to make a direct order, because he had not heard the comments himself. The judge suggested that defense counsel speak to Powell, whereupon Powell stated, "Mr. Seaton has commented on me and f----- me in my a-- two or three different times since I have been in [the] courtroom now. Now, that's out of line. Now, you admonish him because of his outrageous behavior." The judge then enjoined everyone from making any personal comments about any of the parties, counsel or any other officers of the court. Within minutes, one of the prosecutors informed the court that Powell was making inappropriate comments, which were not specified, to the prosecutors. Powell was admonished again.[6]

---

[6]We note that this entire interchange was outside the presence of the jury.

During the penalty phase of the trial, Powell angrily interrupted the testimony of a former neighbor, accusing the witness of lying. The court recessed early for lunch, admonishing Powell to "cool off." After court resumed, but before the jury was brought in, the court stated:

> We observed, for the record, that Mr. Powell reacted angrily to the testimony of his former neighbor, Bob Yoho, the individual who knew him from his home town. Rather than allow the defendant to continue with his verbal outburst, the court took a recess for lunch. . . . Now, for the record, we have had some additional developments since we broke for lunch; is that correct?

The bailiff then informed the court that when Powell was told he would remain in leg shackles (as apparently had been decided in chambers), he looked at the officers and said, "What are you looking at, you pig scumbag," and "Before this is over I'll get one of you. Take off your badge and your gun, I'll whip your a--," and "I am quicker than I seem to be," or "I'm quicker than I appear." The bailiff told the court that Powell went on to say "Before this is over, I'll get your eye, I'll take your eye." One of the prosecutors informed the court that when she came back from the lunch break, Powell made remarks to her of a sexual nature, and stated, "If they want to see violence, I'll show them violence." The court ordered Powell to be put in leg and arm restraints for the remainder of the penalty phase.

Later in the penalty phase, defense counsel requested that the shackles be removed prior to Powell testifying in order to avoid prejudicing the jury. The court ordered Powell to remain in hand and leg shackles, explaining that the ruling was based on Powell's outbursts and his "hair-trigger temper" which resulted in the need to protect the safety of the jury and court personnel. The defense then requested alternatively that Powell be unshackled but accompanied by law enforcement personnel while he was on the witness stand. The court asked the bailiff if that arrangement was acceptable to him, and the bailiff indicated that he thought Powell should be in leg shackles because of the close proximity of the witness stand to the bench and the jury. The court then ruled that Powell's hands and arms would be unshackled but that the leg shackles would remain. The leg shackles could not be seen by the jury while Powell was on the witness stand. During Powell's testimony, the bailiff sat in the jury box.

Powell asserts that it was error for the district court to force him to appear in shackles during the penalty phase of the trial and to be accompanied by law enforcement personnel.

The standard for restraint during the penalty phase is eluci-

dated in *Duckett v. State,* 104 Nev. 6, 752 P.2d 752 (1988). In *Duckett,* this court stated that the right of a defendant to be free from shackles during the guilt phase of the trial is designed to protect the presumption of innocence. *Id.* at 11, 752 P.2d at 755. During the penalty phase, there is no longer a presumption of innocence and therefore the constitutional guarantee to be free of prison garb and shackles no longer exists. *Id.* During the penalty phase, public safety concerns are to be afforded greater significance. *Id.* The decision concerning restraint of the defendant during the penalty phase of the trial is within the sound discretion of the trial court, after balancing the state's interests for safety against the interests of the defendant. *Id.* The court's decision will not be overturned absent an abuse of discretion. *Id.*

In *Duckett,* this court stated that the defendant stood convicted of a brutal murder of two people, for which the death penalty could be imposed, and he "might have concluded that he had nothing to lose from further acts of violence." *Id.* at 12, 752 P.2d at 755. The facts in this case demonstrate an even greater need for security than the facts in *Duckett.* Here, Powell threatened to poke out the eyes of law enforcement officers, made sexual remarks to a prosecutor, harassed a witness and threatened to "show [the court] violence." We hold that it was not an abuse of discretion to shackle Powell during the penalty phase of the trial.

### Delegation of Discretion to the Bailiff

Powell also argues that the district court erred in delegating its discretion with regard to security measures to the bailiff. Powell asserts that it was error for the district court to ask the bailiff if it was acceptable to him that Powell be unshackled while on the witness stand.

When exercising discretion in restraining the defendant, a trial judge has the right to give heed to an officer of the court's knowledge regarding the defendant's record, characteristics and tendencies. *State v. McKay,* 63 Nev. 118, 157, 165 P.2d 389, 406 (1946). The trial judge may also consider the officer's recommendation. *Id.*

The record clearly indicates that the court was exercising its own discretion in determining which method of restraint was appropriate under the circumstances and merely consulted the bailiff for his opinion. We note that the court also considered the wishes of both defense counsel and the prosecution. The bailiff was the officer who heard the defendant threaten to poke out an

officer's eye. The bailiff clearly had knowledge of Powell's tendencies and characteristics, and the district court was entitled to consider the bailiff's knowledge. We therefore find no merit in Powell's contention.

### Evidence of a Prior Bad Act in the Penalty Phase

During the penalty phase of the trial, Thomas Kucera (Kucera) testified that he formerly ran a halfway house for parolees and that Powell stayed there in early 1989. After Powell had been at the halfway house for two weeks, Kucera's twelve-year-old daughter informed him that Powell had molested her, whereupon Kucera told Powell to move out. Kucera telephoned Powell's probation officer to report the incident while Powell was present. Powell then said angrily, "I am going to kill you. No, I am not going to do it. I will have somebody else do it." The trial court allowed the testimony, finding that the probative value of the evidence outweighed the prejudice to Powell.

Powell asserts that the testimony of the molestation should not have been admitted, as it was more prejudicial than probative. *See* NRS 48.035(1). Powell argues that the testimony of the death threat could have been introduced without the reference to the molestation and that the testimony created an impression in the jury's mind that Powell had a pattern of mistreating young girls.

During a penalty hearing, "evidence may be presented concerning aggravating and mitigating circumstances relative to the offense, defendant or victim and on any other matter which the court deems relevant to sentence, whether or not the evidence is ordinarily admissible." NRS 175.552. This court has previously sanctioned the admission of testimony during a penalty hearing regarding an attempted sexual assault. Biondi v. State, 101 Nev. 252, 699 P.2d 1062 (1985). In *Biondi,* this court held that character evidence which is neither dubious nor tenuous is properly admitted during the penalty hearing. *Id.* at 257, 699 P.2d at 1065-66. Testimony regarding sexual assault is relevant to the defendant's character. *Id.* Powell fails to make any argument as to how Kucera's testimony was not credible. Further, the testimony regarding the molestation was an integral part of explaining the death threat against Kucera. We therefore conclude that the district court was within the range of its discretion in finding the testimony was more probative than prejudicial.

### "Anti-sympathy" Jury Instruction

Part of Jury Instruction No. 12, which was given during the

penalty phase, read: "A verdict may never be influenced by sympathy, prejudice or public opinion. Your decision should be the product of sincere judgment and sound discretion in accordance with these rules of law."

Powell argues that a reasonable juror could interpret the language as an instruction to discard mercy and compassion as well as the mitigating circumstances in sentencing him.

Powell's contention is without merit. In Riley v. State, 107 Nev. 205, 808 P.2d 551 (1991), we stated, "This court has previously ruled that it is not error to instruct the jury not to be influenced by sympathy if the court also instructs the jury to consider mitigating circumstances." *Id.* at 215, 808 P.2d at 557 (citations omitted). Here, the jury was instructed to consider mitigating circumstances. Based on our holding in *Riley,* it was not error to give this instruction.

*Instruction on "Any Other Mitigating Circumstances"*

The jury was instructed on mitigating circumstances in Jury Instruction No. 8, which provides in relevant part:

> Murder of the First Degree may be mitigated by any of the following circumstances, even though the mitigating circumstance is not sufficient to constitute a defense or reduce the degree of the crime;
>
> . . . .
>
> 8.  Any other mitigating circumstances.

Powell takes exception with the phrase "any other mitigating circumstances." Powell argues that this "catch-all" language fails to provide the jury with specific guidelines for considering mitigating evidence of his background and character.

This court considered the exact same argument in Flanagan v. State, 107 Nev. 243, 810 P.2d 759 (1991), *vacated on other grounds,* 112 S.Ct. 1464 (1992). There, this court stated:

> [A] reasonable juror would conclude that mitigation was not restricted to crime-related factors because it was stated that the mitigating circumstances did *not* have to constitute a defense or reduce the degree of the crime. Furthermore, the jury in fact found two of the three mitigating circumstances to exist. In addition, the instruction as a whole adequately informed the jury of its right and duty to consider mitigating evidence. Finally, it is highly unlikely that a different outcome would have resulted from more specific instructions, given that the evidence of aggravating circumstances was overwhelming and clearly outweighed the mitigating circumstances found by the jury. Thus, we conclude that

Instruction 8 did not violate the Eighth Amendment by impermissibly limiting the jury's consideration of mitigation to evidence related to the crime.

*Id.* at 249, 810 P.2d at 762-63. (Emphasis in original.)

Here, the jury was similarly instructed that it could find a mitigating circumstance even though that circumstance was not sufficient to constitute a defense or reduce the degree of the crime. The jury also found four aggravating circumstances and *no* mitigating circumstances; the aggravating circumstances obviously outweighed the mitigating circumstances. In light of *Flanagan*, Powell's argument is without merit.

## NRS 177.055 Considerations

This court must consider the certain issues in all cases where the death penalty is imposed under NRS 177.055. NRS 177.055 provides in relevant part:

> 2. [T]he sentence must be reviewed on the record by the supreme court, which shall consider, in a single proceeding if an appeal is taken:
>
> . . . . .
>
> (b) Whether the evidence supports the finding of an aggravating circumstance or circumstances;
>
> (c) Whether the sentence of death was imposed under the influence of passion, prejudice, or any arbitrary factor; and
>
> (d) Whether the sentence of death is excessive, considering both the crime and the defendant.

We will discuss each of these issues in turn.

The evidence clearly supported the finding of the aggravating circumstances in this case. NRS 177.055(2)(b). Powell was under a sentence of imprisonment for three crimes: robbery with a firearm and two counts of second degree burglary (aggravating circumstances under NRS 200.033(1)). Further, the evidence which was admitted at the penalty hearing firmly established that Powell had previously been convicted of a felony involving the use or threat of violence to another: robbery with a firearm (aggravating circumstance under NRS 200.033(2)).

We have examined the record and conclude that the sentence was not imposed under the influence of passion, prejudice or any arbitrary factor. NRS 177.055(2)(c). We also conclude that the sentence of death is not excessive. Over time, Powell repeatedly subjected four-year-old Melea to brutal beatings, one of which eventually took her life. Every surface of the child's body was covered with injuries, literally head to toe. She had suffered several head injuries and her spine was fractured. Further, at the

penalty hearing, only one witness appeared on Powell's behalf. The defense investigator who contacted Powell's family and friends indicated that he was unable to find one person who had "anything good to say" about Powell. We therefore conclude that given the crime and the defendant, the sentence of death was not excessive. NRS 177.055(2)(d).

### Conclusion

We have considered Powell's remaining allegations of error and find them to be without merit. Consequently, we affirm the judgment against him and the sentence of death.