RONALD DUCKSWORTH, JR. AND CARL LEE MARTIN, APPELLANTS, v. THE STATE OF NEVADA, RESPONDENT.

No. 25415

July 15, 1997

942 P.2d 157

*Gensler & Kuehn,* Las Vegas, for Appellant Ducksworth.

*Sgro & Perry,* Las Vegas, for Appellant Martin.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Stewart L. Bell,* District Attorney, and *James Tufteland,* Chief Deputy District Attorney, and *Kimberly Maxson,* Deputy District Attorney, Clark County, for Respondent.

# OPINION

*Per Curiam:*

This appeal arises out of the convictions of Ronald Ducksworth, Jr., and Carl Lee Martin on a variety of charges involving the murders of Joseph Smith III (Joey) and Vikki Smith (Vikki). Joey and Vikki's bodies were found at their Las Vegas home on April 11, 1992. Ducksworth and Martin were arrested for the murders in May 1992.

After a two week trial, the jury found both Ducksworth and Martin guilty of all crimes charged. Both defendants appeal their convictions on a variety of theories discussed below. We conclude that no errors occurred with regard to Ducksworth's conviction, and we affirm that conviction. However, we conclude that Martin was prejudiced by the district court's failure to sever the trials and that Martin's conviction must be reversed and the matter remanded to the district court for a new trial.

## FACTS

This case arises out of the murders of Joey and his wife Vikki at their home in Las Vegas. On April 11, 1992, Joseph Smith, Jr. (Smith), Joey's father, arrived at Joey's house at approximately 1:30 p.m. Joey did not answer the door, and because Smith was concerned about Joey and Vikki, he decided to try to get into the house to see if they were alright.

Smith entered the house through the back door, which was not locked. Upon entering the house, he walked down a hallway and saw Joey's dead body lying face down on the floor in the northwest bedroom with a pillow over his head and dried blood around

his head. A large piece of telephone cord and a telephone also lay near him on the floor. Joey was dressed in a black T-shirt, white shorts, white socks, and black tennis shoes and was not wearing any of the jewelry which he usually wore. Smith found Vikki's dead body in the southwest bedroom. She was wearing only a nightgown, and her hands had been bound to the leg of one of the bunk beds in the bedroom. Her underpants had been cut at the seams and were found under her body, and there was dried blood around her body.

Detective Robert Leonard from the Las Vegas Metropolitan Police Department testified regarding the state of the crime scene. He stated that the perpetrators had been searching for valuables because the contents of drawers in the northwest bedroom had been emptied and sorted through. Also, the contents of a jewelry box had been emptied onto one of the bunk beds, and many of the closet doors throughout the house stood open. Finally, Vikki's purse had been emptied onto the living room couch.

The carpet underneath the lower part of Vikki's pelvic area was covered in lotion. In the bathroom was a pair of size five black pants lying in the sink that had a substantial amount of a lotion on them. Testimony revealed that much of the evidence from the scene was tainted by this lotion.

Dr. Jordan performed the autopsies on Joey and Vikki and testified as follows. Vikki had been shot three times, twice in the head and once in the arm. Joey had been shot three times in the head, and Dr. Jordan testified in the preliminary hearing and on direct and cross-examination that all three of the shots were instantaneously fatal. However, the State recalled Dr. Jordan to the stand to question him about the gunshot wounds, and Dr. Jordan stated that one of the gunshot wounds was not as lethal as the others, but that it was still a lethal wound. The spent casings at the scene revealed that two different nine millimeter weapons were used to kill Joey and Vikki. Based on the state of decomposition, testimony indicated that Joey and Vikki could have been killed in the early morning of Thursday, April 9, 1992. However, the time of death could not be stated with any great certainty. The state of decomposition did indicate, however, that Joey and Vikki were killed at approximately the same time.

An examination of Vikki's sexual organs was conducted but revealed no evidence of trauma or bruising. The sexual assault kit performed on Vikki revealed no semen in her body. Small semen stains were found on the black pants and on the carpet, but these stains were not large enough to yield any evidence of the specific blood group of the perpetrator. Additionally, two separate hairs were recovered from Vikki's nightgown; one was similar to Vikki's hair samples and the other was similar to Ducksworth's

hair samples. The same type of lotion described above was also found on Vikki's vulva and appeared to be in the vaginal cavity.

The following events led up to the murders of Joey and Vikki. On Wednesday, April 8, 1992, Joey, Martin, Martin's brother Bobby Ray Martin (Bobby), Ducksworth, and Sharee McQueen all drove from Riverside, California, to Las Vegas in Joey's white Mazda.

Sharee was romantically involved with Joey at the time of his death, and she testified that for the two or three days prior to the trip to Las Vegas, Joey had been with her in California. She also testified that he had approximately $2,700 in cash with him; however, when his body was found, he did not have any money.

Joey brought his nine millimeter gun on the trip, and Sharee testified that she recognized the gun because Joey had it at her home in California and that it had recognizable chips and scratches in the paint of the chamber. She noticed it in the car because Joey had it in his lap and then put it under the front seat on the driver's side.

When the group arrived in Las Vegas, they went directly to the Vacation Village Resort where Joey got Sharee a room. Joey left the gun under the seat of the car when he went into the office of the hotel. The four men then left the hotel, and at that time Joey was wearing a primarily black T-shirt with small green and white polka dots, white shorts, and black tennis shoes.

Sharee fell asleep for awhile, and when she woke up, she called Martin to find out if he had seen Joey. Martin told her that Joey was probably somewhere with Vikki. Sharee then told Martin to come pick her up so that she could go back to California. The next morning, April 9, 1992, Martin came by the Vacation Village and picked Sharee up. Martin had a nine millimeter gun in the back seat "for protection," but Sharee testified that she had not seen this particular nine millimeter gun before.

Sharee stayed at Martin's house in Las Vegas for the next two nights and then drove back to California with Martin. The day after she returned to California, she visited her sister, Nikki McQueen, in Riverside, California. At that time, Nikki was one of Ducksworth's girlfriends.

While Sharee was staying with Nikki, she saw Joey's nine millimeter gun under the mattress in Nikki's room. She also testified that she saw Ducksworth wearing a gold link bracelet that Joey had been wearing the night he left her at the Vacation Village. Nikki testified that several days after Ducksworth returned from Las Vegas, she found two guns underneath her mattress. She had never seen either gun, but identified one as a black handgun. She also testified that a few days after Ducksworth's return, she noticed that Ducksworth was wearing a gold necklace and bracelet she had never seen before.

Additionally, Ducksworth gave Nikki a woman's gold wedding band with a single diamond. Because it was too small for Nikki, Ducksworth took the ring, allegedly to have it sized for Nikki; however, Nikki testified that the diamond actually ended up in one of Ducksworth's nugget rings. Several days after Ducksworth's arrest, Nikki confronted him regarding whether the ring he had tried to give her had been Vikki's. She stated that he acted hurt and did not want to talk about it.

Donnette Peach testified that she was dating Bobby Martin at the time of the murders. She testified that just after midnight on April 9, 1992, the probable date of the murders, Bobby called her at the Las Vegas home of her mother, Donna Gibbs. She testified that during this conversation she heard Joey, Ducksworth, and Martin's voices. At approximately 12:30 a.m., Bobby came alone to Gibbs' house to pick her up.

After Bobby and Donnette left Gibbs' house, they went to a Travel Lodge. They stayed there until Bobby was paged on his beeper thirty-five minutes later. Bobby returned the page from the hotel room phone then told Donnette they were leaving. They went back to Gibbs' house, where he used the phone again. Donnette testified that the conversation lasted about five or six minutes and then she and Bobby left the house again. Only a few blocks from the house, they made a U-turn and returned to Gibbs' house because Bobby's pager had gone off again. This time Bobby left Donnette in the car while he went into Gibbs' house.

Gibbs testified regarding the second phone call. She stated that after Bobby and Donnette left after the first phone call, Ducksworth called wanting to speak to Bobby. Donna told him they had just left, but that she could beep Bobby. After she beeped Bobby, he came back. Since Ducksworth had waited on the phone for Bobby's return, she simply handed the phone over to Bobby. Donna testified that Ducksworth sounded "hysterical, upset" and said that he had to leave and get back to California.

Donnette testified that she fell asleep while she was waiting for Bobby to return from making the second telephone call. She woke up at about 7:00 a.m. that same morning, April 9, 1992, realizing that they were headed back to California and that Ducksworth had joined them. Upon arriving in Riverside, Bobby checked Donnette into a motel and then took Ducksworth elsewhere.

On April 10, 1992, Donnette, her sister Tamica, Bobby, and Ducksworth went to visit Donnette's brother, William Dale, at his house in Long Beach. Dale testified that while they were visiting him in Long Beach, Ducksworth asked him if there was anywhere he could hide a gun "just in case something happens." Dale testified that when Ducksworth showed him the gun, he recognized it as Joey's nine millimeter gun by the scratches on

the chamber. He had seen Joey with the same gun several weeks before at his mother's (Gibbs') house.

On the night of April 11, 1992, Donnette learned of Joey's and Vikki's deaths from Dale and his wife. Dale had heard the news from his mother. At the time the group heard about the murders, Donnette testified that Bobby "got like real emotional," but that Ducksworth did not show any emotion. Donnette testified that at some time while she was in California, she and Tamica visited Bobby and Martin's mother in Los Angeles.

Donnette returned to Las Vegas on April 13, 1992. That night she saw Martin at Gibbs' house. Martin pulled her aside and told her not to tell anyone she was back, let anyone know where she had been, or tell anyone that she had been at his mother's house in Los Angeles or where his mother lived.

Smith testified that Martin came by his house on April 12, 1992, and told Smith that he did not have anything to do with the murders and, in fact, had not even arrived in Las Vegas until late Thursday night (April 9) or early Friday morning (April 10). Additionally, Martin stated that he did not know where Joey lived and had never even been to Joey's house because Vikki did not like him.

On April 13, 1992, Dale saw Martin at Gibbs' house in Las Vegas. Dale testified that he had a conversation with Martin about how Joey died. Dale then told Martin that Joey "didn't have to die like he died." Martin responded that it was "all part of the game" and that Joey was just "somebody out there to use." Dale also testified to a conversation with Martin at Gibbs' house after a viewing of Vikki and Joey on April 16, 1992. In that conversation, Martin told Dale that he knew that Joey had been killed first in front of Vikki and that Vikki had been sodomized. Dale also testified that he had given a statement to the police at the end of April, during which he stated that Martin admitted to him that he had killed Joey in front of Vikki.

Additionally, Dale testified that on the day of the viewing, he saw Martin wearing the nugget ring that Gibbs had given Joey. Gibbs testified that she had given Joey the ring in March of 1992 when both Joey and Martin were at her house. Both expressed interest in the ring, but because she had showed the ring to Joey first, she told Martin he would have to get it from him. Every time she saw Joey after that, he had the ring on. When Dale asked him at the viewing about his wearing the ring, Martin simply said that Joey had let him wear the ring.

Gibbs also saw Martin on April 15, 1992, when he came by her house. While Martin was at her house, a police officer stopped by to check on Gibbs' youngest daughter. Gibbs stepped out of the house, and the officer showed her some pictures of

three men, including Martin. When Gibbs went back into the house and told Martin what had happened, Martin told her to "watch [her] back 'cause by knowing the cops [she] could come up missing."

Kenya Crawl, one of Ducksworth's girlfriends with whom he had a child in 1992, testified regarding incriminating statements he had made to her about his involvement in the murders. She stated that on April 9, 1992, Ducksworth called her at about 3:00 a.m. and said that he had just killed Joey. However, she did not believe Ducksworth's claims until she saw a story about the murders on television on April 11, 1992. After the news coverage, Ducksworth called her and asked if they had any suspects. When she told him no, he stated: "We must have took care of business proper."

Crawl testified that she did not like Joey because in 1989 he had tried to force her to have sex with him and that Ducksworth knew about the incident. Ducksworth told her that on the night of the murders, he had questioned Joey about what he tried to do to her, and this resulted in a fight between Ducksworth and Joey.

Crawl testified that she and Ducksworth had several discussions regarding the murders of Vikki and Joey. Ducksworth told her that Joey had been shot twice in the head and that Vikki had also been shot in the head. He also admitted to stealing money from Joey, but adamantly denied having anything to do with Vikki's rape or murder. Ducksworth also tried to give Crawl a ring, but because she suspected it might have belonged to Vikki, she told him she did not want the ring.

After the news coverage of the murders, Crawl had to move out of her apartment. She moved in with a friend, Brenda Shuaid, for about three weeks. After this, she moved in with Brenda's husband, Al Shuaid. During her stays with both Brenda and Al Shuaid, she continued to have conversations with Ducksworth regarding the murders.

Al testified regarding five or six of Crawl's conversations with Ducksworth which he had overheard. Eventually, Al talked to Ducksworth directly, and he also testified regarding those conversations. Al testified that he had overheard Ducksworth say, and also was told by Ducksworth, that he had killed Joey. Al testified that Ducksworth told him that he killed Joey for his attempted sexual assault of Crawl, that Ducksworth had told him that he and Joey had gotten in an argument over this, and as a result of this argument, he shot Joey in the car. Ducksworth got into Joey's house by dragging Joey up to the door, knocking on the door and telling Vikki to let them in because Joey had been hurt. Ducksworth told Al that initially Vikki refused to let them in, but after

she looked out the peephole and saw Joey wrapped up in a blanket, she opened the door.

Ducksworth also told Al that Vikki had been both sodomized and sexually assaulted orally, that he had nothing to do with the acts committed on Vikki, and that he was, in fact, "a hundred percent" against any harm being done to Vikki. Al stated that Ducksworth emphasized this in several conversations. Ducksworth stated that in an attempt to cover up any semen, the lotion had been squirted into her vagina. Ducksworth also confessed to Al that money, jewelry, and a small amount of "dope" had been stolen from Joey and Vikki.

Testimony was also presented regarding the disappearance of Joey's Mazda. Deon Hopkins testified that on her way to work at about 5:20 a.m. on the morning of April 9, 1992, she saw two men driving Joey's white Mazda. She testified that at the time of the murders, she had known Joey for twenty years and knew his car when she saw it. She stated that at the intersection she honked her horn, but neither occupant reacted. Normally, had Joey been in the car, he would have honked back at her. Based on the fact that the occupants did not react, she knew that Joey was not in the car.

She stated that after she realized that Joey was not in the car, she got "nosy" and drove up right next to the side of the car. Hopkins testified that she got a sufficient look at the driver, and based on photographs shown to her by police, she identified the driver as Martin. However, Carolyn Paige, Hopkins' passenger, testified that she could not see who was in the car because it was dark at 5:20 in the morning. She also testified that she recalled there being a dark tint on the windows.

Joey's Mazda was later found at the Vacation Village. An employee of the Vacation Village at the time of the crimes testified that the Mazda sat in the parking lot unmoved between April 9, 1992, and April 14, 1992, when the police located it. When the car was investigated, the following was discovered. The stereo had been ripped out, Joey's cellular phone was on the front seat, and a nine millimeter casing lay on the floorboard between the right front passenger's seat and the door. A black holster and gun belt were found underneath the right front seat. Blood was found in the car on the driver's seat headrest, on the floorboard behind the seat, and on the console next to the emergency brake; the blood found in the car was tested and was consistent with Joey's blood type. However, no bullet holes were found in the car. Two cigarette butts were recovered from the inside of the car and tested, and the saliva found on the cigarette butts was consistent with the sample of saliva that Martin had given to law enforcement officials. Additionally, Martin's fingerprints were found in the car.

After Martin and Ducksworth had returned to California, both were staying with Nikki McQueen. While they were staying at McQueen's apartment, police surveillance was set up outside the apartment to monitor their activities. On May 19, 1992, at approximately 6:00 a.m., Riverside police officers contacted Nikki as she left her apartment. They asked for her consent to search her apartment, and she signed a consent to search form.

At 7:00 a.m., Riverside police officers, secreted behind a fence in back of the apartment, received word that Martin and Ducksworth were trying to flee on foot. After Martin and Ducksworth tried to climb over the fence, they were taken into custody.

On October 19, 1993, the jury found both Martin and Ducksworth guilty of the following charges: two counts of murder with use of a deadly weapon, two counts of first degree kidnapping with use of a deadly weapon, and one count each of burglary with use of a deadly weapon, sexual assault with use of a deadly weapon, robbery with use of a deadly weapon.

Martin's and Ducksworth's sentences were the same. For the two counts of murder, both were sentenced to two consecutive life sentences without the possibility of parole and mandatory additional consecutive life sentences for the weapons enhancement. On the burglary charge, both were sentenced to ten years with an additional mandatory ten year weapon enhancement, the sentence to be served consecutively to the murder charges. For robbery with use of a deadly weapon, both were sentenced to fifteen years plus an additional fifteen years for weapons enhancement, the sentence to be served consecutively to the murder charges. Finally, for the sexual assault charge and the two kidnapping charges, both were sentenced to three terms of life imprisonment with consecutive life imprisonments for use of a deadly weapon, the sentences to run concurrently with each other and the murder sentences. Both defendants appeal.

## DISCUSSION

### Appellant Ducksworth

*Ducksworth was not denied the opportunity to cross-examine a key witness at the penalty hearing*

Ducksworth claims that he was denied his constitutional right to confront and cross-examine Crawl at the penalty hearing regarding her involvement in an uncharged murder case. During the penalty phase of the trial, evidence was presented that both Ducksworth and Martin were involved in an uncharged murder, assault, and robbery at the LeGardy house in February of 1992. Testimony was also presented that two women were involved.

Because Crawl testified at trial regarding Ducksworth's confession to Joey's murder, the State intended to call Crawl to the stand at the penalty hearing to elicit any evidence from her regarding Ducksworth's involvement in the LeGardy murder. The State assumed that because Ducksworth had confessed to her regarding his involvement in the murder of Vikki and Joey, he would have done the same with regard to the LeGardy murder.

However, outside the presence of the jury, the district court was informed that Crawl herself may have been one of the persons involved in the LeGardy murder.[1] The district court allowed Crawl to be questioned outside the presence of the jury, and Crawl indicated that she would invoke her Fifth Amendment rights in regard to any question about the LeGardy murder. The court then refused to allow either side to call Crawl to testify.

In United States v. Compton, 365 F.2d 1, 5 (6th Cir. 1966), the court addressed the issue of a party calling a witness that it knows will exercise his or her Fifth Amendment rights. The court stated:

> Government counsel need not refrain from calling a witness whose attorney appears in court and advises court and counsel that the witness will claim his privilege and will not testify. However, to call such a witness, counsel must have an honest belief that the witness has information which is pertinent to the issues in the case and which is admissible under applicable rules of evidence, if no privilege were claimed. It is an unfair trial tactic if it appears that counsel calls such a witness merely to get him to claim his privilege before the jury to a series of questions not pertinent to the issues on trial . . . .

*Id.*

This is essentially what the defense was attempting to do in its attempt to call Crawl to the stand. Defense counsel claimed that it wanted to elicit Crawl's testimony because she might provide exculpatory evidence for the defendants. However, the district court noted that other witnesses had already provided incriminating evidence against the defendants regarding the LeGardy murder and that nothing in Crawl's testimony would exculpate them.

---

[1] Ducksworth argues that the prosecution improperly withheld the evidence of Crawl's potential involvement in the LeGardy murder in violation of Brady v. Maryland, 373 U.S. 83 (1963). However, because the prosecution disclosed the impeaching evidence to the defense counsel the day after Crawl disclosed the evidence, we conclude that there was no error.

Therefore, it appears that the defense wanted Crawl to take the stand and invoke her Fifth Amendment rights in an attempt to persuade the jury to make negative inferences about her credibility. Based on this, we conclude that the district court did not err in refusing to allow the defense to call Crawl as a witness at the penalty hearing.

*The premeditation instruction given at trial was constitutional*

Ducksworth claims that the premeditation instruction given to the jury was unconstitutional and vague and that it misstated the amount of time necessary for premeditation. We disagree. Prior to trial, the district court gave the following instruction to the jury regarding premeditation:

> Premeditation is a design, a determination to kill, distinctly formed in the mind at any moment before or at any time of the killing.
> Premeditation need not be for a day, an hour, or even a minute. It may be as instantaneous as successive thoughts of the mind. For if the jury believes from the evidence that the acts constituting the killing has been preceded by and has been the result of premeditation, no matter how rapidly the premeditation is followed by the act constituting the killing, it is willful, deliberate and premeditated murder.

Ducksworth claims that this definition of premeditation is vague and ambiguous. However, in Powell v. State, 108 Nev. 700, 709, 838 P.2d 921, 926 (1992), *overruled on other grounds by* Powell v. Nevada, 511 U.S. 79 (1994), we concluded that the same instruction properly defined the concept of premeditation. Therefore, we conclude that the instruction was not unconstitutional or vague.

Furthermore, in Briano v. State, 94 Nev. 422, 425, 581 P.2d 5, 7 (1978), we stated that to prove premeditation "it [does not] matter how short a time existed between the formation of the design to kill and the killing itself." Because the jury instruction given in the instant case comports with *Briano,* we conclude that the instruction properly defined the amount of time necessary for premeditation. *See Powell,* 108 Nev. at 709-10, 838 P.2d at 927 (stating that the same jury instruction as the one in the instant case comported with *Briano*).

*The district court did not err in refusing to give Ducksworth's proposed penalty phase instructions*

Ducksworth claims that the district court erred by not substi-

tuting his proposed instructions for the ones read at trial. We have stated that upon request, criminal defendants are entitled to jury instructions on their theories of a case so long as there is some evidence, regardless of how weak or incredible, to support their theories. Harris v. State, 106 Nev. 667, 670, 799 P.2d 1104, 1105-06 (1990). "However, a criminal defendant is not entitled to an instruction which incorrectly states the law." Geary v. State, 110 Nev. 261, 265, 871 P.2d 927, 929 (1994).

At the penalty phase, Ducksworth objected to jury instructions 18, 19, and 30 and instead proposed instructions A, B, and C. In instructing the jury, the district court did not substitute Ducksworth's instructions when it instructed the jury. We conclude that the district court did not err.

Ducksworth's proposed instruction A concerned the sentence for first degree murder and was essentially the same as jury instruction 22; thus, the district court did not err in refusing Ducksworth's proposed instruction. Jefferson v. State, 108 Nev. 953, 954, 840 P.2d 1234, 1235 (1992). Ducksworth's proposed instructions B and C concerned the aggravating circumstances, and because Ducksworth did not receive the death penalty, we conclude that he was not prejudiced by the district court's failure to give the instructions.

*The evidence adduced at trial was sufficient for the jury to find defendant guilty of sexual assault with the use of a deadly weapon but insufficient to find defendant guilty of first degree kidnapping with the use of a deadly weapon as to victim Joey Smith*

This issue was raised for the first time in Ducksworth's reply brief, and pursuant to NRCP 28(c), we are not required to consider the issue. However, because of the serious nature of the crimes and the length of the sentence imposed, we will reach the issue.

Ducksworth asserts that the evidence at trial was insufficient to warrant a finding that he was guilty of either the sexual assault on Vikki or first degree kidnapping with respect to Joey. We disagree as to the sexual assault conviction, but agree as to the kidnapping conviction.

"The relevant inquiry for this Court is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " Koza v. State, 100 Nev. 245, 250, 681 P.2d 44, 47 (1984) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

Evidence indicated that Vikki's nightgown was moved above her waist, her underwear was cut off, a pair of scissors was found on the dresser nearby, a tampon was found inside the bedroom on the floor close to the body, semen was present on the inside of a pair of black jeans found in the bathroom as well as on the floor under the victim's pelvic area, and Ducksworth's hair was found on Vikki's nightgown. Also, Crawl and Al testified that Ducksworth admitted that the victim had been raped, albeit not by him.

Ducksworth claims that all this equals only circumstantial evidence of sexual assault. However, Ducksworth admitted that Vikki had been raped, although he was not involved in the acts, and that he was present when the acts occurred. Additionally, evidence revealed that the only physical evidence found on Vikki was a hair found on her nightgown that matched Ducksworth's. Therefore, a rational jury could conclude that Ducksworth had sexually assaulted Vikki. Furthermore, the jury was instructed on the law regarding aiding and abetting a crime and could have concluded that Ducksworth had aided and abetted in the commission of the sexual assault.

However, we conclude that sufficient evidence did not support Ducksworth's conviction for the kidnapping of Joey. The kidnapping charge was apparently based on Ducksworth's carrying Joey from the car to the house after he had shot Joey. Ducksworth confessed to Al that he had shot Joey once in the car, and Joey's blood was located in the car. Despite Dr. Jordan's testimony that one of the three shots was not as lethal as the others, he stated on three separate occasions that all three gunshot wounds were instantaneously fatal. Therefore, the only logical inference from the State's evidence was that Joey was dead when Ducksworth wrapped him in the blanket and took him from the car to the front door.

Kidnapping requires the willful seizing, confining, or carrying away of a live person. Cf., Atkins v. State, 112 Nev. 1122, 1127, 923 P.2d 1119, 1122 (1996) (stating that Nevada's sexual assault statute requires a live victim). Because all of the testimony indicated that Joey was dead before he was moved, we conclude that no rational trier of fact could have found the essential elements of the kidnapping charge beyond a reasonable doubt. As such, we reverse Ducksworth's conviction for the kidnapping charge regarding Joey. We note that because the sentence for the

kidnapping ran concurrent to the sentences for the murder convictions, we have not, in practical terms, reduced Ducksworth's sentence.

*Appellant Martin*

*The district court erred in refusing to grant a severance*

Martin asserts that the district court erred in failing to grant a severance. NRS 174.165 allows the district court to sever a joint trial "[i]f it appears that a defendant . . . is prejudiced by a joinder of . . . defendants . . . for trial together." Additionally, the decision to sever is left to the trial court's discretion and will not be reversed absent a showing of abuse of discretion. Amen v. State, 106 Nev. 749, 756, 801 P.2d 1354, 1359 (1990). Because we conclude that Martin was prejudiced by the joinder at trial with Ducksworth, we reverse his conviction and remand the matter to the district court for a new trial.

The evidence against Martin was largely circumstantial and was much less convincing than was the evidence against Ducksworth. Most damaging to Martin was the testimony of Crawl and Al concerning Ducksworth's confessions which mentioned, both directly and by inference, that Ducksworth had acted with an accomplice. Crawl testified that after Ducksworth had confessed to her that he had killed Joey and she had informed him that the police had no suspects, Ducksworth told her that, "*We* must have took care of business proper." (Emphasis added.) Additionally, Crawl and Al both testified that Ducksworth had told them that Vikki had been sexually assaulted and sodomized, but that he had not been involved in those acts. This testimony created the inference that Ducksworth had acted with an accomplice. On appeal, the State relied heavily on the evidence presented by Crawl and Al to prove that Martin's conviction for sexual assault was supported by sufficient evidence. For example, the State claimed that "Martin also might have committed the offense [of sexual assault] for the simple reason that Ducksworth admitted to doing everything else except those crimes that occurred against Vikki."

The district court gave a limiting instruction before both Crawl and Al's testimony that the testimony was only to be considered in relation to Ducksworth and also gave a general limiting instruction before deliberations began. Martin made motions to sever following both Crawl and Al's testimony, which were denied because the court believed that the jury clearly understood that the testimony only applied to Ducksworth. However, we

conclude that this was error because Ducksworth's confessions referred to another unnamed person, and it is likely that the jury deduced that this other person was Martin. This conclusion is bolstered by the fact that Martin and Ducksworth sat together at trial, and testimony had indicated that Martin and Joey were friends and that Martin, Joey, and Ducksworth all drove from California together.

We conclude that because Ducksworth did not testify, the introduction of his confession, which probably inculpated co defendant Martin, violated Martin's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment. Stevens v. State, 97 Nev. 443, 444-45, 634 P.2d 662, 663-64 (1981) (citing Bruton v. United States, 391 U.S. 123, 126 (1968)).

In *Stevens,* the appellant's co-defendant made several incriminating statements to officials before the grand jury. Prior to introducing the statements, the prosecution excised all the references to appellant. However, in reversing the conviction and remanding for a new trial, we stated:

> It appears likely that the jury read the appellant's name into the blanks in each one of [co-defendant's] statements introduced at the trial below. The circumstantial links between [the co-defendant] and [the appellant], referred to by the prosecutor, and the fact that [the co-defendant] and appellant were being tried together made it not only natural, but seemingly inevitable, that the jury would infer appellant to be the person referred to in the blanks in [the co-defendant's] statements.

*Id.* at 444, 634 P.2d at 663. The instant case is substantially similar to *Stevens.* The testimony of Crawl and Al was relevant only against Ducksworth. However, in confessing, Ducksworth mentioned an unnamed accomplice, and we conclude that the jury inevitably inferred that Ducksworth's accomplice was Martin.

While a *Bruton* violation does not automatically require reversal of Martin's conviction, we conclude that because it is not clear beyond a reasonable doubt that the improper use of the confession was harmless error, a reversal of Martin's conviction and remand to the district court is warranted. *Stevens,* 97 Nev. at 445, 634 P.2d at 664.

Because we reverse Martin's conviction and remand the case for a new trial, we need not reach Martin's remaining issues on appeal.

## CONCLUSION

We reverse Ducksworth's conviction for kidnapping with regard to Joey, but conclude that all of Ducksworth's other contentions on appeal lack merit. However, because we conclude that the district court erred in failing to grant Martin's motion for severance, we reverse his convictions and remand the case to the district court for a new trial.[2]

---

[2]THE HONORABLE A. WILLIAM MAUPIN, Justice, did not participate in the decision of this matter.